**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

GEORGE HENGLE and LULA WILLIAMS,    :
*on behalf of themselves and all individuals*  :
*similarly situated*,       :  Case No. _____3:18cv100_____
           :
     Plaintiffs,    :
           :
v.            :
           :
MARK CURRY, AMERICAN WEB LOAN, INC.,  :
AWL, INC., RED STONE, INC., MEDLEY   :
OPPORTUNITY FUND II LP, and MEDLEY  :
CAPITAL CORPORATION,    :
           :
     Defendants.    :
_____:

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs George Hengle and Lula Williams ("Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, by counsel, and for their Class Action Complaint against Defendants, they allege as follows:

## INTRODUCTION

1.    Most states have enacted usury laws that limit the amount of interest that a company may charge on a loan. To evade these laws, payday lenders originated their loan products in the name of national banks, who were exempt from state interest-rate caps under the National Bank Act. *See* 12 U.S.C. § 85. Under these arrangements, the bank served as a conduit for the loans in exchange for a fee, but the payday lender funded, serviced, and collected the loans—a tactic known as "rent-a-bank." When federal regulators began cracking down on these rent-a-bank arrangements, the payday lenders developed a solution—they adapted the structure to use Native

American tribal entities as the conduit to ostensibly cloak the loans in tribal sovereign immunity.[1] Hence, the new structure has been dubbed "rent-a-tribe" lending.

2.      This case involves a rent-a-tribe enterprise created and operated by Defendant Mark Curry ("Curry")—an entrepreneur with no lineage to the Otoe-Missouria Tribe.[2] For the past six years, Curry's companies, namely the MacFarlane Group, Inc., made millions of dollars through loans issued in the name of Defendant American Web Loan—an entity formed under the laws of the Otoe-Missouria Tribe for the dual purpose of avoiding state and federal laws and concealing the role of Curry's companies. Although American Web Loan is held out as the "lender" of the internet loans, the Otoe-Missouria Tribe had minimal involvement in the operations and received a mere 1% of the net profits from the loans.

3.      On the other hand, Curry's companies, namely the MacFarlane Group, reaped nearly all the profits; provided the infrastructure to market, fund, and collect the loans; and controlled the tribal companies' bank accounts. In other words, Curry and the MacFarlane Group were the *de facto* lenders and controlled the day-to-day operations of American Web Loan. *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, No. CV157522JFWRAOX, 2016 WL 4820635, at *6 (C.D. Cal. Aug. 31, 2016) (finding a rent-a-tribe operator was the "true lender" under the circumstances). Curry participated in and oversaw the illegal lending enterprise rendering him personally liable. *Id.* at *11 (C.D. Cal. Jan. 19, 2018) (finding the president and chief executive

---

[1] *See, e.g.,* Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012) (providing background on payday loans and describing the rent-a-tribe model as "the most recent incarnation of payday lending companies regulation-avoidance").

[2] The Otoe-Missouria Tribe of Indians is a federally recognized Native American tribe headquartered in Red Rock, Oklahoma. The Tribe has approximately 3,000 enrolled members, the majority of which live off-reservation.

officer of a rent-a-tribe lending business liable for a $10.2 million-dollar judgment because "he directly participated in and had the ability to control" the deceptive acts).

4.     Faced with mounting pressure against similar rent-a-tribe ventures and a cease and desist issued to the Otoe-Missouria Tribe by the State of New York, Curry "sold" the MacFarlane Group to Defendant Red Stone, Inc.—a company owned by the Otoe-Missouria Tribe—in an attempt to shield MacFarlane Group's illegal business practices. The sale was completed through a merger of the MacFarlane Group with Red Stone so the Defendants could claim—albeit in contradiction to state law—that MacFarlane was now "an arm of the tribe" and, thus, protected by tribal immunity for its *pre-merger misconduct*. Nev. Rev. Stat. Ann. § 92A.250(1)(d) (establishing that when "a merger takes effect" the "surviving entity has all of the liabilities of each other constituent entity[.]").[3] Even though the key entities were reorganized and renamed, however, the

---

[3] Plaintiffs anticipate that American Web Loan and Red Stone will claim to be "an arm of the tribe" and thus protected by tribal immunity. Although the doctrine of tribal sovereign immunity protects the tribe itself, it does not automatically extend to economic subdivisions of a tribe, and the Court must determine whether these entities are "analogous to a governmental agency, which should benefit from sovereign immunity" or whether they are more like a "commercial business enterprise, instituted for the purpose of generating profits for [their] private owners." *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1184 (10th Cir. 2010) (citing *Gavle v. Little Six, Inc.,* 555 N.W.2d 284, 293 (Minn.1996)). In addition to the allegations alleged in this Complaint concerning the creation, purpose, and structure of the rent-a-tribe enterprise, American Web Loan is not entitled to sovereign immunity because 99% of the profits of the scheme went to non-tribal participants and the companies were established for the sole purpose of evading state usury laws. Further, Red Stone simply absorbed a Nevada company, MacFarlane Group, for the purpose of avoiding legal responsibility. *Sommerlath v. Cherokee Nation Distributors, Inc.*, 686 F.3d 1144, 1149–50 (10th Cir. 2012) (explaining that sovereign immunity "is inapplicable to entities which are legally distinct from their members and *which voluntarily subject themselves to the authority of another sovereign which allows them to be sued*.") Red Stone's purchase of the MacFarlane Group "voluntarily subject[ed] [itself] to the authority of another sovereign," and it should be treated like any other foreign limited liability company or domestic corporation. *Id.* at 1154 (Gorsuch, J., concurring). Accordingly, neither American Web Loan nor Red Stone qualify as arms of the tribe.

rent-a-tribe venture continues to operate in the same manner—with nominal involvement of and benefit to the Otoe-Missouria Tribe.

5.     Through a series of agreements with the MacFarlane Group and American Web Loan, Defendants Medley Capital Corporation and Medley Opportunity Fund II, L.P. ("Medley Defendants") provided the capital used to make the high-interest loans to consumers through the rent-a-tribe enterprise and, in return, generated large profits from its investment in the scheme. Upon information and belief, Medley Defendants reinvested those profits to expand the portfolios of American Web Loan—resulting in the unlawful collection of debt from Virginia consumers.

6.     This lawsuit challenges the legality of the rent-a-tribe loans and seeks to enforce Virginia's longstanding public policy against usurious loans. Based on Defendants' conduct, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. Defendants received millions of dollars derived from the collection of unlawful debt. Further, Defendants acquired and maintained interests in the rent-a-tribe enterprise, actively participated in the scheme, and conspired with each other and others to repeatedly violate state lending statutes resulting in the collection of an unlawful debt from Plaintiffs and the class members. Defendants' acts described herein are unlawful as set forth in 18 U.S.C. § 1962(a)-(d).

7.      Plaintiffs also assert a class claim for violations of Virginia's usury laws. Because the loans exceed 12% annual percentage rate ("APR"), such loans are null and void and neither the lender nor any third party may collect, obtain, or receive any principal, interest, or charges on the loans. 15 U.S.C. § 1541(A). Accordingly, Plaintiffs and the class members seek to disgorge all amounts paid by Virginia consumers in excess of 12%, plus twice the amount of such usurious interest that was paid in the two years preceding the filing of this action and their attorneys' fees and costs. Va. Code § 6.2-305(A).

## JURISDICTION

8.      This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as a majority of Plaintiffs are residents of this District and Division and a substantial part of Plaintiffs' claims occurred in Virginia.

## PARTIES

10.      Plaintiff Lula Williams ("Williams") is a natural person and resident of this Division and District.

11.      Plaintiff George Hengle ("Hengle") is a natural person and resident of this Division and District.

12.      Defendant Mark Curry ("Curry") is a natural person and resident of Puerto Rico. Curry was the founder and chief executive officer of the MacFarlane Group, which Curry created to make and collect the usurious loans described herein. As explained below, Curry was the architect of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise. Curry is also personally liable under Nevada's dissolution laws. Nev. Rev. Stat. Ann. § 92A.250(1)(c).

13.      Defendant American Web Loan, Inc. ("American Web Loan") purports to be a corporation formed under the laws of the Otoe-Missouri Tribe of Indians ("Otoe-Missouri Tribe" or "Tribe") doing business as an internet lending website under the domain name www.americanwebloan.com. In return for a small fraction of the revenue, the Otoe-Missouri Tribe formed American Web Loan under tribal law and allowed it to falsely claim that it was operated

by the Tribe. At all times relevant hereto, the Tribe did not participate in the day-to-day operations of American Web Loan, did not fund the loans or handle the servicing or collection of the loans, and received a nominal percentage of the proceeds from the loans.

14.     Defendant AWL, Inc. ("AWL") is a corporation formed under the laws of the Otoe-Missouri Tribe. AWL is a special purpose corporation formed to allow non-tribal members to hold a security interest in AWL. According to an October 11, 2016, District of Columbia UCC filing, three entities hold a security interest in the assets of Defendant AWL, Inc. (excluding certain tribal trust property and equity interests in tribal entities): First Infinity Holdings, Inc. (Attn: Mark Curry); First Mountain Holdings, Inc. (Attn: Mark Curry); and First CM Holdings, Inc. (Attn: Mark Curry).

15.     Defendant Red Stone, Inc. ("Red Stone"), is a corporation formed under the laws of the Otoe-Missouri Tribe. Due to several governmental enforcement actions against rent-a tribe enterprises, Curry sold MacFarlane Group to Red Stone in an attempt to shield MacFarlane Group's illegal business practices. Red Stone is the "surviving entity" of the merger between Red Stone and the MacFarlane Group.

16.     Defendant Medley Opportunity Fund II, LP (the "Medley Fund") is a Delaware limited partnership with a principal place of business located at 375 Park Avenue, 33rd Floor, New York, New York 10152. Medley played an integral role in the rent-a-tribe enterprise as a pooled investment fund created to raise and provide the capital to fund the millions of dollars of illegal loans made to consumers. The enterprise used the money from Medley to make the illegal loans to consumers and, in return, the enterprise returned profits to Medley and its investors.

17.     Defendant Medley Capital Corporation ("Medley Capital") is a Delaware Corporation with a principal place of business located at 375 Park Avenue, 33rd Floor, New York,

New York 10152. Medley Capital is an investment management company specializing in "lending directly to privately-held middle market companies," such as MacFarlane Group and American Web Loan. Medley Capital is the corporate parent and controlling entity of the Medley Fund.

## FACTUAL BACKGROUND

### A.    Statutory and Regulatory Background

18.    More than forty years before the signing of the Declaration of Independence, Virginia enacted its first usury law, which capped interest rates at 6 percent. John W. Edmonds III, Virginia Law of Interest and Usury, 10 U. Rich. L.R. 77 (1975) (citing 4 Hennings Stat. 194).

19.    Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg. & Inv. Corp.*, 226 Va. 596, 601 (1984).

20.    The Supreme Court of Virginia has repeatedly acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary in permitting this policy to be thwarted." *Id.* (quoting *Heubusch & Reynolds v. Boone*, 213 Va. 414 (1972)).

21.    In accordance with this longstanding public policy, a person may not charge an annual percentage rate ("APR") exceeding 12% without first obtaining a consumer finance license from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A).

22.    If a person violates the interest rate cap, Virginia's Consumer Finance Act "(CFA")" imposes severe consequences, including criminal liability and forfeiture of all principal, interest, and any charges related to the loan. Va. Code § 6.2-1540 (making it a class 2 misdemeanor for any person who violates or participates in the violation of Virginia's interest rate cap); Va. Code § 6.2-1541(A) (declaring such loans "void" and principal uncollectible).

23.     The CFA is designed to protect Virginia consumers from predatory lenders, who have sought to evade state lending laws like Virginia's by entering into ventures with Native American tribes "so they can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Martin & Schwartz, *supra,* 69 Wash. & Lee L. Rev. at 758–759).

**B.      Overview of tribal lending.**

24.     In a "payday" loan, a consumer who can't afford to wait until payday receives a cash advance and, in exchange, the lender subtracts a larger amount from the consumer's paycheck. Consumers renew the loans when they are unable to pay them off, creating a cycle of mounting debt.

25.     Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra,* 69 Wash. & Lee L. Rev. at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611-12 (2010)).

26.     It is no secret that "internet payday lenders have a weak history of complying with state laws." *Id*. at 764. Prior to the rent-a-tribe business model, some payday lenders entered into partnerships with national banks to avoid compliance with state laws.[4]

---

[4] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* at 17-22 (2001), available at http://www.consumerfed.org/pdfs/paydayreport.pdf.

27.     Beginning in 2005, federal regulators began cracking down on rent-a-bank arrangements, and they were nearly eliminated by 2010—largely by the assessment of penalties and fines against participating banks. *See, e.g.*, Creola Johnson, *America's First Consumer Financial Watchdog Is on A Leash: Can the CFPB Use Its Authority to Declare Payday-Loan Practices Unfair, Abusive, and Deceptive?*, 61 Cath. U. L. Rev. 381, 399 n. 16 (2012).

28.     In response to the crackdown on rent-a-bank arrangement, several payday lenders reincarnated the lending model through associations with Native American tribes to avoid state laws. *Id.*; *see also* Martin & Schwartz, *supra* at 1.

29.     "In these partnerships, online payday lenders register businesses on Native American lands and claim to be exempt from lawsuits and state usury caps under tribal sovereign immunity. Using this doctrine, lenders argue that because their businesses are located on or headquartered within the borders of a Native American reservation, they are bound by the laws of that reservation only, not the laws of the state in which the reservation is located or the state in which the borrower resides." *Id.*

## C.     Curry Establishes a Rent-a-Tribe Enterprise to Avoid Usury Laws.

30.     Curry is the architect of the rent-a-tribe lending enterprise described herein—one of the few yet to be criminally convicted for his role in this type of lending scheme.[5]

---

[5] *See* The United States Attorney's Office, Southern District of New York, Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

31.     Curry is the former president, chief executive officer, and majority shareholder of MacFarlane Group, as well as several other companies who participated in the rent-a-tribe enterprise.

32.     As early as 2009, Curry recognized the exorbitant profits he could achieve by not complying with state usury laws.

33.     To that end, Curry established a rent-a-tribe lending model for his company, MacFarlane Group, associating their loans with the Otoe-Missouria Tribe (the "Tribe"), a federally recognized tribe located in Oklahoma.

34.     Although the Tribe held itself out as the actual lender of the loans issued in the name of American Web Loan, the Tribe was merely a front, and MacFarlane Group provided the infrastructure to market, fund, underwrite, and collect the loans, including by providing the following services: marketing, lead generation, technology platforms, payment processing, servicing and collection procedures.

35.     The Tribe allowed Curry and the MacFarlane Group to use its name as a front and, in return, received a 1% flat fee of the revenue. Zeke Faux, *Payday Lenders Find Home on Indian Reservations*, Bloomberg News (Nov. 30, 2014) ("The tribe keeps about 1 percent, according to Charles Moncooyea, who helped strike the deal with Curry in 2010 when he was the tribe's vice chairman.").

36.     After accounting for expenses and payments to investors, the remaining profits were distributed to Curry through the MacFarlane Group. Steve Vockrodt, *American Indian tribe buys Mission-based payday loan servicing firm MacFarlane Group*, The Kansas City Star (Oct. 27, 2016) ("MacFarlane Group generated more than $100 million in revenue from American Web Loan and another website owned by the Otoe-Missouria Tribe, with the tribe keeping 1 percent.").

37.     Because of its limited role, the Tribe had no control over the income or expenses of American Web Loan and, as the tribe's former vice chairman put it: "we didn't have any control at all." Faux, *supra*.

38.     Upon information and belief, tribal members did not participate in the day-to-day operations of American Web Loan and nearly all the activities associated with the lending operation occurred off the Otoe-Missouria Reservation, such as the call centers, payment processing, and servicing of the loans.

39.     Moreover, nearly all activities performed on behalf of American Web Loan were performed by non-tribal officers and employees of MacFarlane Group who were located in offices off the reservation.

40.     Upon information and belief, the money loaned to Plaintiffs was transferred from a bank account owned and operated or controlled by MacFarlane Group and Curry, and neither the Tribe nor its officials were allowed to access the accounts.

41.     Furthermore, neither American Web Loan nor any other purported tribal entity ever accepted consumer payments after the loan agreement was executed. Rather, all payments went to MacFarlane Group, who then kicked back, at most, the 1% flat fee to the Tribe.

42.     In the past few years, federal regulators have begun cracking down on rent-a-tribe arrangements.

43.     For example, the United States Attorney for the Southern District of New York has indicted Scott Tucker and Timothy Muir, competitors of Defendants, for engaging in exactly the same unlawful-lending "rent a tribe" and collection practices alleged herein.

44.     The Tucker indictment, which sets out a strikingly similar set of facts, includes: (1) Mr. Tucker, through the use of shell companies, personally lent money to thousands of consumers

through payday loans; (2) Tucker personally controlled virtually every aspect of the operations of these sham entities; (3) these sham entities shared employees, computer systems, and "other operating costs and infrastructure of a single lending business"; and (4) Mr. Muir acted as general counsel for one of the Tucker entities. *United States v. Tucker*, Case No. 16-crim-091 (S.D. N.Y. Feb. 9, 2016) (Doc. 1 at ¶¶ 1–3).

45.    For example, the indictment explains:

In truth and in fact, as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, while TUCKER and MUIR took steps to create the sham appearance of tribal ownership and control of the Tucker Payday Lenders, Tribes 1–3 played no substantive role in the ownership or operation of the Tucker Payday Lenders at any time. To create the sham appearance of ownership, TUCKER assigned nominal ownership of the Tucker Payday Lenders to Tribes 1-3 (that is, Ameriloan, United Cash Loans, US Fast Cash, Advantage Cash Services and Star Cash Processing were assigned to Tribe 1, One Click Cash was assigned to Tribe 2, and 500 Fast Cash was assigned to Tribe 3), and from time to time caused Tribes 1-3 to appear as the businesses' owners on certain corporate and financial documents. However, in truth and in fact, at all relevant times, and as TUCKER and MUIR well knew, Tribes 1-3 had no power to make any decisions on behalf of any of the Tucker Payday Lenders, no control over the income or expenses of any of the Tucker Payday Lenders, and no entitlement to the Tucker Payday Lenders' profits.

Similarly, to create the sham appearance that Tribes 1–3 not only owned, but operated, the Tucker Payday Lenders, SCOTT TUCKER, the defendant, caused members of two of the tribes (Tribe 1 and Tribe 2) to have a tribal member press a key on a computer on a daily basis on tribal lands to purportedly "approve" the extension of credit on hundreds or thousands of loans that the Tucker Payday Lenders, through their approximately 600 employees in Kansas, had in fact already approved and agreed to provide to customers. TUCKER did not require a third tribe that purportedly owned and operated one of the Tucker Payday Lenders (Tribe 3) to engage in this sham participation in the operations of his business at all.

*Id*. at ¶¶ 23-24.

46.    On October 13, 2017, a jury convicted Tucker and Muir. *United States v. Tucker*, Case No. 16-crim-091 (S.D. N.Y.).

47. Just like the Tucker defendants, Defendants' business relationship with the Tribe was nothing more than an attempt to mislead consumers and regulators by an illusion that Defendants were protected by tribal immunity.

**D.    Curry sells the MacFarlane Group to the Otoe-Missouria Tribe.**

48. In August 2013, the New York Department of Financial Services issued a cease and desist to the Otoe-Missouria Tribe warning it to stop offering its illegal credit products to New York consumers. *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F.Supp.2d 353, 356 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

49. The New York Department of Financial Services also issued warnings to third parties, such as banks and payment processors, to cease providing electronic banking services to American Web Loan, and these third parties "cut back or cut off entirely their financial dealings with the Tribes." *Id*.

50. In response, the Otoe-Missouria Tribe and several others filed a lawsuit in August 2013, seeking declaratory relief and a preliminary injunction that tribal businesses were inherently sovereign nations and not subject to New York law. *Id*.

51. The district court denied the Otoe-Missouria Tribe's request for a preliminary injunction on September 30, 2013, finding that the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands," and thus, the loans were "subject to the State's non-discriminatory anti-usury laws." *Id*. at 361.

52. The court reasoned, "There is simply no basis… that the Tribes are treated differently from any other individuals or entities that enter New York to lend to New York resident." *Id*.

53. The Second Circuit affirmed the decision, 769 F.3d 105, which was a death knell to the rent-a-tribe business model. *See, e.g., Pennsylvania by Shapiro v. Think Fin., Inc.*, No. 14-

CV-7139, 2018 WL 637656, at *3 (E.D. Pa. Jan. 31, 2018) (describing an e-mail from the chief financial officer of another rent-a-tribe venture regarding the impact of the ruling in *Otoe-Missouria*).

54.     In addition, various lawsuits and government enforcement actions against Defendants' competitors brought negative attention to his sham business model.[6]

55.     Faced with the loss in *Otoe-Missouria* and the mounting pressure against similar ventures, Curry developed a solution that allowed him to continue to retain the majority of the profits, yet create additional layers of protection from liability.

56.     The solution was the sale of the MacFarlane Group to Red Stone, a tribal entity, in an effort to further insulate the scheme from liability. *See* Certificate of Ownership and Merger (Sept. 21, 2016) (attached as Exhibit 1).

57.     Upon information and belief, while the MacFarlane Group "merged" with Red Stone, it continues to be operated in the same manner and by the same individuals who ran MacFarlane Group—none of whom are affiliated with the Tribe.

58.     And regardless of the merger, Nevada's dissolution laws allow Plaintiffs to bring these claims against Curry and Red Stone. Nev. Rev. Stat. Ann. § 92A.250(1)(c) (establishing that when "a merger takes effect" the "owner of a constituent entity remains liable for all the obligations of such constituent entity existing at the time of the merger to the extent the owner was liable before the merger[.]"); *see also* Nev. Rev. Stat. Ann. § 92A.250(1)(d) (establishing that when "a

---

[6] *See, e.g.*, *In Re Cashcall, Inc.*, 2013 WL 3465250, at *1 (NH Banking Dept. 2013) ("it appears that Western Sky is nothing more than a front to enable CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators."); *Consumer Fin. Protection Bureau v. CashCall, Inc.,* No. 1:13-cv-13167 (Mass) (complaint filed on Dec. 16, 2013); *In re Moses,* No. 12-05563-8-RDD, 2013 WL 53873, at *4 (Bankr. E.D.N.C. Jan. 3, 2013).

merger takes effect" the "surviving entity has all of the liabilities of each other constituent entity[.]"); Nev. Rev. Stat. Ann. § 92A.250(1)(c).

**E.      Medley's Role in the Enterprise.**

59.      Medley Capital, through its ownership interest in and control over the Medley Fund, provided substantial capital to fund the loans to consumers and worked together with the other entities described herein to systemically perpetrate fraud and to scam consumers.

60.      As explained above, the Medley Fund was created by Medley Capital to allow investors to purchase interests in the consumer loans originated by the rent-a-tribe scheme.

61.      Upon information and belief, Medley Capital invested and reinvested its own money in the Medley Fund and raised money from third party investors who were issued shares in the Medley Fund.

62.      Medley Fund provided the capital to the McFarlane Group, who then used it to fund the loans made in the name of American Web Loan. Faux, *supra* ("Curry, whose payday-loan websites have been sanctioned by state regulators for the past seven years, is in turn backed by a New York hedge fund, Medley Opportunity Fund II.")

63.      For example, on or around December 2011, Medley Fund provided MacFarlane Group with at least $30 million dollars and, in return, Medley received a first priority security lien on all assets of the MacFarlane Group.

64.      The MacFarlane Group used the $30 million-dollar loan to issue loans in the name of American Web Loan.

65.      Medley Fund reinvested funds into the American Web Loan enterprise on or about September 2014. *See* Uniform Commercial Code Report (Sept. 29, 2014) (attached as Exhibit 2).

66.     Medley Fund continued to invest and provide additional capital to the MacFarlane Group; and still provides financing for the loans through June 2016. (June 27, 2016) (attached as Exhibit 3).

67.     Upon information and belief, Medley Fund continues to provide financing for the loans to date.

**F.      Defendants' Loans Violated Virginia's Usury Laws.**

68.     Defendants marketed, initiated, and collected usurious loans in Virginia. Curry chose Virginia as a place where loans and collection efforts would ensue, and he participated in and knew of the actions of MacFarlane Group and American Web Loan in Virginia.

69.     Curry knew the subject loans were illegal under Virginia law, but he pursued the scheme anyway through MacFarlane Group and American Web Loan.

70.     In order to qualify for the loan product, consumers were required to electronically sign a form contract created by Curry and MacFarlane Group—not created by the Tribe.

71.     Under the terms of the standard Loan Agreements, the interest rates charged were significantly greater than 12% APR.

72.     For example, Defendants charged Hengle with an APR of 737.97%—over 60 times the 12% interest cap in Virginia for companies that are not licensed by the Commission. Va. Code § 6.2-303(A).

73.     Similarly, Defendants charged Williams with an APR of 593.12%.

74.     None of the Defendants had a consumer finance license permitting them to make loans charging interest in excess of 12% APR when they made the loans to Plaintiffs nor did they ever attempt to obtain such a license. *See* Va. Code § 6.2-1501. The Tribe also did not have a consumer finance license in Virginia.

75.     Accordingly, Defendants' loans are null and void, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiffs. Va. Code § 6.2-1541(A).

76.     Defendants received at least $4,397.20 from Hengle as a result of Defendants' illegal loans to him—most of which Defendants credited as payment for interest or other fees.

77.     Defendants received at least $2,718.87 from Williams as a result of Defendants' illegal loan to her—most of which Defendants credited as payment for interest or other fees.

78.     Through their ownership interest and participation in the enterprise, Defendants received amounts collected from Plaintiffs and the class members' loans.

79.     Because Plaintiffs' loans were null and void, and it was unlawful any person to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiffs. Va. Code § 6.2-1541(A).

80.     Defendants' conduct also violated § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c).

81.     RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

82.     Defendants charged an interest rate far in excess of the enforceable rate established by Va. Code § 6.2-1541(A), and, thus, Defendants violated RICO's prohibition against the collection of unlawful debt.

83.     As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT ONE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(a)
## (CLASS CLAIM AGAINST MEDLEY FUND AND MEDLEY CAPITAL)

84.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

85.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as:

> All consumers residing in Virginia when they entered into a loan agreement with American Web Loan.

86.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a subclass initially defined as:

> All consumers residing in Virginia when they entered into a loan agreement with American Web Loan where the loan was originated and/or any payment was made on or after February 13, 2014.[7]

87.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

88.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions

---

[7] Plaintiffs allege a subclass because they anticipate Defendants will argue that RICO's four-year statute of limitations applies to any loans originated or payments made prior to February 13, 2014. However, "the Supreme Court has established that the discovery-of-injury accrual rule applies to civil RICO actions." *Dickerson v. TLC The Laser Eye Ctr. Inst., Inc.*, 493 F. App'x 390, 393 (4th Cir. 2012) (citing *Rotella v. Wood*, 528 U.S. 549, 556 (2000). Because consumers could not have known or reasonably discovered their injuries caused by *Defendants' conduct*, the proper class should include all consumers who entered into a loan agreement with American Web Loans.

include: (1) whether Curry, MacFarlane Group, American Web Loan, Red Stone, Medley Capital, and Medley Fund constitute an "enterprise" under RICO; (2) whether Medley Capital or Medley Fund used or invested the part of that income to acquire an interest in, to establish, or to operate the enterprise; and (3) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

89. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

90. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

91. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized

litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

92.     **Injunctive Relief Appropriate for the Class.**  **Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in the enterprise, including the receipt of any proceeds arising from the unlawful collection of debt; prohibiting Defendants from continuing to engage in the enterprise or selling the outstanding balances on the loans to any third parties.

93.     All of the loans made to Virginia residents included an interest rate far in excess of twice the enforceable rate in Virginia and, thus, the loans constitute "unlawful debt" under RICO. 18 U.S.C. § 1961(6).

94.     As alleged above, Medley Capital and Medley Fund violated § 1962(a) of RICO through the receipt of income derived, directly and indirectly, through collection of unlawful debt; and through the use and reinvestment of parts of such income to acquire interests in and to further establish and assist the operations of the enterprise.

95.     Medley Capital and Medley Fund participated in the collection of the unlawful debt as a principal by aiding, abetting, procuring proceeds from the enterprise, and willfully investing money for the purpose of the unlawful scheme.

96.     Plaintiffs and the class members were injured as a result of Medley Capital and Medley Fund's violations of 18 U.S.C. § 1962(a) because the loans would not have been made but for their investment and participation in the enterprise.

97.     Accordingly, Medley Capital and Medley Fund are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT TWO:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(b)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

98.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

99.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class, initially defined as:

> All Virginia residents who executed a loan with American Web Loan where the loan was originated and/or any payment was made.

100.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a subclass initially defined as:

> All consumers residing in Virginia when they entered into a loan agreement with American Web Loan where the loan was originated and/or any payment was made on or after February 13, 2014.

101.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

102.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no

factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether Curry, MacFarlane Group, American Web Loan, Red Stone, Medley Capital, and Medley Fund constitute an "enterprise" under RICO; (2) whether Defendants acquired and maintained an interest in the enterprise; and (3) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

103.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

104.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

105.   **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate injunctive relief with respect to Plaintiffs and the class members. Plaintiff and the putative class seek an injunction ordering Defendants to divest themselves of any interest in the enterprise, including the receipt of any proceeds arising from the unlawful collection of debt; prohibiting Defendants from continuing to engage in the enterprise or selling the outstanding balances on the loans to any third parties.

106.    As alleged above, Defendants § 1962(b) of RICO by acquiring and maintaining interests in and control of the enterprise involved in the unlawful collection of debt.

107.    Defendants participated in the collection of the unlawful debt as a principal by aiding, abetting, procuring proceeds from the enterprise, and by willfully acquiring and maintaining interests in and control of the enterprise.

108.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(b) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

109.    As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

### COUNT THREE:
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
### (CLASS CLAIM AGAINST CURRY, AMERICAN WEB LOAN, AWL, AND RED STONE)

110.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

111.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as:

> All Virginia residents who executed a loan with American Web Loan where the loan was originated and/or any payment was made.

112.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a subclass initially defined as:

> All consumers residing in Virginia when they entered into a loan agreement with American Web Loan where the loan was originated and/or any payment was made on or after February 13, 2014.

113.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

114.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether Curry, MacFarlane Group, American Web Loan, Red Stone, Medley Capital, and Medley Fund constitute an "enterprise" under RICO; (2) whether Defendants conducted the affairs or participated in the enterprise's affairs; (3) whether the loans violated Va. Code § 6.2-1501 because the interest rates were too high; and (4) what is the proper recovery for Plaintiffs and the class members against each Defendant.

115.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

116.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the

members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

117. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

118. **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiff and the putative class seek an injunction ordering Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

119. All of the loans made to Virginia residents included an interest rate far in excess of twice the enforceable rate in Virginia.

120.    As alleged above, Curry, MacFarlane Group, American Web Loan and AWL associated with the enterprise and participated in the affairs of the enterprise, which existed for the purpose of collection of unlawful debt.

121.    Defendants' participation in the enterprise violated § 1962(c) of RICO and caused Plaintiffs to repay amounts on unlawful loans.

122.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

123.    Moreover, Nevada's dissolution laws allow Plaintiffs to bring any claims against MacFarlane Group against Curry and Red Stone. Nev. Rev. Stat. Ann. § 92A.250(1)(c)-(d).

**COUNT FOUR:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

124.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

125.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as:

> All Virginia residents who executed a loan with American Web Loan where the loan was originated and/or any payment was made.

126.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a subclass initially defined as:

> All consumers residing in Virginia when they entered into a loan agreement with American Web Loan where the loan was originated and/or any payment was made on or after February 13, 2014.

127.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class

members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

128.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** As explained above, common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

129.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

130.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

131.   **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in the enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in the enterprise; and ordering the dissolution of each Defendant that has engaged in the enterprise.

132.     As alleged above, Defendants violated § 1962(d) of RICO by entering into a series of agreements to conspire to violate §§ 1962(a)-(c), including but not limited to: (1) the original agreement between MacFarlane Group and American Web Loan whereby 1% of the revenue would be provided to the Tribe in return for the use of its name, (2) the merger agreements between MacFarlane Group and Red Stone, and (3) the loan agreements whereby Medley Fund and Medley Capital agreed to provide $30 million dollars of financing for the loans.

133.     Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

**COUNT FIVE:**
**VIOLATIONS OF VIRGINIA USURY LAWS**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

134.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

135.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

> **Virginia Usury Class**: All Virginia residents who made a payment on any loan with American Web Loan.

> **Virginia Usury Subclass**: All Virginia residents who made a payment on any loan with American Web Loan on or after February 13, 2016.

Plaintiffs are members of the Virginia Usury Class and Subclass.

136.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

137. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).**
Common questions of law and fact exist as to all members of the putative class, and there are no
factual or legal issues that differ between the putative class members. These questions predominate
over the questions affecting only individual class members. The principal issues include: (1)
whether the loans made to Virginia consumers violated Virginia Code Section § 6.2-1501 because
their interest levels were too high; (2) whether Plaintiffs may recover from Defendants the amounts
paid on the loans; and (3) what is the proper recovery for Plaintiffs and the class members against
each Defendant.

138. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of
each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of
action as the other members of the putative class. All claims are based on the same facts and legal
theories.

139. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate
representatives of the putative class because their interests coincide with, and are not antagonistic
to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel
competent and experienced in such litigation, and they intend to continue to prosecute the action
vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the
members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them
to not vigorously pursue this action.

140. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the
class members predominate over questions affecting only individual members, and a class action
is superior to other available methods for fair and efficient adjudication of the controversy. The
damages sought by each member are such that individual prosecution would prove burdensome

and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

141. All of the loans made to Virginia consumers in the name of American Web Loan contained interest rates greater than 12%.

142. As explained above, Defendants each received revenues collected on the loans.

143. Accordingly, Plaintiffs and the class members are entitled to recover all amounts repaid on the void loans, plus twice the amount of such usurious interest that was paid in the two years preceding the filing of this action and their attorney's fees and costs. Va. Code § 6.2-1541; Va. Code § 6.2-305(A).

## COUNT SIX:
### UNJUST ENRICHMENT
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

144. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

145. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Virginia Unjust Enrichment Class"—initially defined as follows:

**Virginia Unjust Enrichment Class**: All Virginia residents who executed a loan with American Web Loan where any amount of principal, interest, fees, or other charges were repaid.

Plaintiffs are members of the unjust enrichment class.

146. **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from Virginia consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

147. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiffs and the class members conferred a benefit on Defendants; (2) whether Defendants knew or should have known of the benefit; (3) whether Defendants retained an unjust benefit because the loan was void; and (4) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

148. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

149. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the

members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

150.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

151.    All of the loans to Virginia consumers in the name of American Web Loan were void and unenforceable.

152.    Plaintiffs conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefit; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

153.    Accordingly, on behalf of themselves and all other Virginia consumers similarly situated, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with American Web Loan.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that the Court enter judgment on behalf of themselves and the class they seek to represent against Defendants for:

A.     Certification for this matter to proceed as a class action;

B.     Declaratory, injunctive, and damages relief as pled herein;

C.     Attorney's fees, litigation expenses, and costs of suit; and

D.     Such other or further relief as the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**PLAINTIFFS**

By:____*/s/ Kristi C. Kelly*_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com
Email: casey@kellyandcrandall.com

Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com
Email: casey@kellyandcrandall.com

James W. Speer, VSB#23046
VIRGINIA POVERTY LAW CENTER
919 E. Main Street, Suite 610

Richmond, VA 23219
(804) 782-9430
(804) 649-0974
Email: jay@vplc.org

*Counsel for Plaintiffs*