**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

GEORGE HENGLE and LULA WILLIAMS, *on* )
*behalf of themselves and all individuals similarly* )
*situated*, )
     )
        Plaintiffs, )
     )
v. )       Civil Action No. 3:18-cv-100-REP
     )
MARK CURRY, AMERICAN WEB LOAN, )
INC., AWL, INC., RED STONE, INC., )
MEDLEY OPPORTUNITY FUND II LP, and )
MEDLEY CAPITAL CORPORATION, )
     )
        Defendants. )

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO**
**FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1) BY DEFENDANTS**
**AWL, INC.; AMERICAN WEB LOAN, INC.; AND RED STONE, INC.[1]**

Plaintiffs' claims against AWL should be dismissed because the Otoe-Missouria Tribe of

Indians—a federally recognized Indian tribe—retains sovereign immunity that deprives the

federal courts of jurisdiction over claims against AWL. It is well-established that tribal

immunity extends to "arms of the tribe" that conduct commercial activities. An entity is an arm

of the tribe where, as here, (1) the tribe created it pursuant to tribal law, (2) its purpose is to fund

essential tribal programs, (3) the tribe controls it, (4) the tribe intended for it to have sovereign

immunity, (5) the tribe depends on it for essential revenue and benefits, and (6) finding it

immune protects tribal self-determination and promotes tribal economic development. Although

---

[1] In addition to AWL, Inc., the Complaint names American Web Loan, Inc. and Red Stone, Inc. (among others) as defendants. American Web Loan, Inc. is AWL, Inc.'s pre-2016 name (as well as a name under which AWL, Inc. still occasionally does business). Red Stone, Inc. is owned by the Otoe-Missouria Tribe and is the successor-in-interest to MacFarlane Group, Inc. (the assets of which were assigned to AWL, Inc. in 2016). Unless otherwise specified, this memorandum refers to AWL, Inc., American Web Loan, Inc., and Red Stone, Inc. collectively as AWL.

plaintiffs dispute that AWL is an arm of the Tribe, including on the ground that AWL was not genuinely directed and controlled by the Tribe, their arguments are refuted both by the Tribe's history and by the decade of events leading up to this lawsuit.  The Tribe's governing body was not duped by savvy businessmen, and it is not "renting" its sovereign immunity to entities unconnected to the Tribe.  Rather, the Tribe created AWL to benefit its people—a role that AWL has fulfilled—under the Tribe's supervision.  It is a quintessential arm of the tribe entitled to sovereign immunity.  The claims against AWL should therefore be dismissed.

## STATEMENT OF FACTS

### A.    The Otoe-Missouria Tribe

1.    The Otoe-Missouria Tribe, a federally recognized Indian tribe, is a "'separate sovereign[] pre-existing the Constitution.'"  *United States v. Bryant*, 136 S. Ct. 1954, 1962 (2016) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978)).  The Tribe's lineage traces to two tribes, the Otoe and the Missouria, that settled in the lower Missouri River Valley in the 16th century.  Shotton Decl. ¶ 8.

Throughout the 1800s, the Tribe entered into treaties with the United States, giving up certain land in exchange for a government-to-government relationship defined by friendship, protection, and just and proper treatment.  Shotton Decl. ¶ 12.  The U.S. government broke its promises, however, confining the Tribe to a reservation in southeast Nebraska in order to accommodate settlers seeking farm lands west of the Mississippi.  *Id.* ¶ 13.  The Tribe's historic way of life, hunting buffalo, was also forcibly ended by the federal government, which favored an agricultural economy.  *Id.*  The Tribe attempted to learn the agrarian lifestyle, but struggled to keep non-Indian settlers off the land the United States had promised.  *Id.*  In 1881, the Otoe-Missouria were again relocated, this time to their current lands in Red Rock, Oklahoma.  *Id.* ¶ 14.

Around the turn of the 20th century, Congress attempted to assimilate Indians by opening tribal lands for non-Indian settlement—including the Otoe-Missouria's land in Red Rock. Shotton Decl. ¶ 15; *see also County of Yakima v. Confederated Tribes & Bands of the Yakima Nation*, 502 U.S. 251, 253-254 (1992). Tribal members were "allotted" a certain number of acres, usually from the least-desirable areas, with the "surplus," i.e., desirable, land sold to non-Indians. Armen H. Merjian, *An Unbroken Chain of Injustice:  The Dawes Act, Native American Trusts, and* Cobell v. Salazar, 46 Gonz. L. Rev. 609, 616-617 (2011). This process robbed the Otoe-Missouria of large portions of their land, leaving the Tribe's members with a collection of allotted plats held in trust for their benefit by the United States. Shotton Decl. ¶ 15.[2]

2.      In 1984, the Tribe established a constitutional government that exercises the Tribe's sovereign powers. Shotton Decl. Ex. A. The constitution provides for both a General Council comprising all tribal members who are registered to vote, *see id.* art. V, and a seven-member Tribal Council consisting of a Chairperson, Vice-Chair, Secretary, Treasurer, and three Members-at-Large, *see id.* art. VI. The Tribal Council functions as both executive and legislature. It possesses the authority "to transact business and otherwise speak or act on behalf of the Tribe," to delegate any of the Council's powers to subordinate committees or representatives, and to "enact ordinances and adopt regulations to administer governmental functions of the Tribe." *Id.* art. VIII, § 1.

Council members serve three-year staggered terms. Shotton Decl. Ex. A art. VII, § 1. Elections for certain Council seats are held each November. *Id.* art. VII, § 2. All enrolled tribal

---

[2] The allotment era came to an end in 1934 when Congress passed the Indian Reorganization Act. 48 Stat. 984. By then, however, the damage was irreparable. *See generally Cobell v. Norton*, 240 F.3d 1081, 1087-1088 (D.C. Cir. 2001).

adults are eligible to vote upon registration.  *Id.* art. VII, § 8.  The Tribe's constitution also sets forth recall procedures applicable to any elected official.  *Id.* art. VII, § 10.

### B.    The Tribe's Economic Difficulties

The Tribe's geographic isolation and other factors have long resulted in significant economic hardship; its members experience high unemployment rates and a lack of access to fundamental resources.  Shotton Decl. ¶ 19.  The Tribe's Chairman estimates that 40% of members live below the federal poverty line.  *Id.*  Alcohol, opioid, and other substance abuse are chronic problems on tribal lands.  *Id.*

The Tribe's ability to address these problems via tax revenue, however, is limited. Shotton Decl. ¶ 20.  As the Supreme Court has recognized, "'there is no stable tax base on most reservations,'" *Michigan v. Bay Mills Indian Community*, 134 S. Ct. 2024, 2044-2045 (2014) (Sotomayor, J., concurring) (quoting Matthew M. Fletcher, *In Pursuit of Tribal Economic Development as a Substitute for Reservation Tax Revenue*, 80 N.D. L. Rev. 759, 774 (2004))— including the Otoe-Missouria's.  Hence, even high tax rates would yield insufficient revenue. Furthermore, the Tribe cannot tax much of the property within its jurisdiction because it is held in trust and therefore tax-exempt.  *See* 25 U.S.C. § 2210.  Finally, Oklahoma taxes most tribal members' salaries, further eroding the Tribe's small tax base.  *See* Decision No. 2002-07-16-011, Oklahoma Tax Commission (July 16, 2002), https://www.ok.gov/tax/documents/2002-07-16-011.pdf; *see also* Anne Zimmerman, *Taxation of Indians:  An Analysis and Comparison of New Mexico and Oklahoma State Tax Laws*, 41 Tulsa L. Rev. 91, 106-110 (2005).[3]

---

[3] Funding that the Tribe receives from the federal government is not remotely sufficient, Shotton Decl. ¶ 20, and in any event is not guaranteed—as President Trump's proposed budget for fiscal year 2019 starkly illustrates, *see* National Congress of American Indians, *Analysis of the FY 2019 President's Budget* at 4 (Feb. 13, 2018), http://www.ncai.org/FY2019_Presidents_Budget_Analysis7.pdf.

Given these constraints, the Tribe has long pursued commercial options to raise revenue. It has had some success building and operating casinos. Shotton Decl. ¶ 22. In 2007, however, the neighboring state of Kansas authorized much more extensive gaming, leading many Kansas residents to gamble in-state rather than traveling to Oklahoma to visit the Tribe's casinos. *Id.* The Tribe's gaming revenue plummeted as a result. *Id.*

### C. The Tribe's Creation Of AWL

1. Facing a funding crisis from the lost gaming revenue, the Tribal Council looked to other potential business opportunities. Shotton Decl. ¶ 23. But the Tribe's land is too remote for traditional enterprises to thrive. *Id.* ¶ 19. E-commerce therefore appealed to the Council, because it could take place on the Tribe's lands yet reach customers across the country. *Id.* ¶ 23. Once the Tribe learned that online consumer lending was a possibility, it spent almost a year researching the business and deliberating how it could get involved. *Id.* With that due diligence completed, the Council in 2010 created American Web Loan, Inc. as a "sub-agency of the Tribal Council and an agency of the Tribe," "for the purpose of providing revenues with which the Tribe may address other pressing matters of public health, safety, and welfare, or other tribal purposes." Shotton Decl. Ex. D §§ 201, 202. The 2010 AWL Act vested AWL with the power to "make any and all types of consumer loans and credit financing pursuant to this Act." *Id.* § 207(d). It also extended the Tribe's privileges and immunities to AWL—including its sovereign immunity from suit. *Id.* § 401.

Because the Tribe lacked the capital and experience to build a consumer-lending operation from scratch, it relied on outside guidance and funding. Shotton Decl. ¶ 29. That guidance came from MacFarlane Group, Inc. and its owner, Mark Curry, who had both access to capital and experience running lending businesses. *Id.* ¶¶ 29-30. Through AWL, the Tribe also entered into contracts for identity verification, risk assessment, website hosting, call-center

5

oversight, and other services needed to run a lending operation.  *Id.* ¶ 30.  One vendor that provided services to AWL was MacFarlane Group, Inc.  *Id.*

From its inception, AWL has been regulated by the Otoe-Missouria Consumer Financial Services Regulatory Commission.  *See* Shotton Decl. Ex. D § 207(d).  The Commission—each member of which is appointed by the Tribal Council—licenses lenders, supervises their operations, and enforces tribal laws against those lenders.  *See* Shotton Decl. Ex. B §§ 7.9(b)(1), 7.12(b), 7.13.  In 2010, the Commission granted AWL an operating license, which is a "revocable privilege to conduct Consumer Financial Services . . . within the Tribe's jurisdiction." *Id.* § 4.1(b).  AWL's license must be renewed biennially, with the next renewal in 2019.  *Id.* § 4.5; Shotton Decl. Ex. G.  Renewal will be denied if AWL fails to meet specified criteria relating to its integrity, strength, and solvency.  *See* Shotton Decl. Ex. B §§ 4.3, 4.5.

One of the laws the Commission enforces against AWL and other lenders is the Tribe's Consumer Financial Services Ordinance, which sets forth a robust set of borrower protections. *See* Shotton Decl. Ex. B.  The Ordinance requires licensed lenders to comply with the consumer-protection provisions contained in federal lending laws, such as the Truth In Lending Act, 15 U.S.C. § 1601 *et seq.*; the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*; and the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*  Shotton Decl. Ex. B § 5.1.  At the same time, the Ordinance makes clear that the Tribe has not waived AWL's immunity from suit under those statutes' enforcement mechanisms.  *Id.* §§ 5.1, 7.6.

The Ordinance prohibits certain conduct by licensed lenders.  For example, lenders may not publish "any advertisement that contains false, misleading or deceptive statements or representations," "[e]ngage in unfair, deceptive, abusive, or fraudulent practice or unfair or deceptive advertising," offer loans that "include a Balloon payment at maturity," or charge

interest and fees other than those "agreed upon by the parties."  Shotton Decl. Ex. B §§ 5.2(b); 6.1(e), (f).  Licensed lenders are also required to give borrowers specified disclosures concerning the law applicable to loans, and must allow borrowers to rescind any lending transaction before 5 pm on the second business day following origination.  *Id.* § 6.1.

The Ordinance reinforces AWL's statement of purpose by enumerating the specific governmental purposes for which lending proceeds can be used.  Profits received from AWL, or any other licensed lender owned by the Tribe, can be used only to (1) "fund the Tribe's government operations or programs," (2) "provide for the public health and general welfare of the Tribe and its members and visitors to the Tribal community," (3) "promote the Tribe's economic development and self-sufficiency," or (4) "donate to charitable organizations." Shotton Decl. Ex. B § 1.3.

2.      As the expiration dates of the Tribe's agreements with Curry and others grew near, the Tribal Council considered steps to increase the revenue it received from AWL.  After deliberation, it concluded that the Tribe's interests would be best served if it purchased MacFarlane Group outright and brought the services MacFarlane Group was providing in-house. Shotton Decl. ¶¶ 31-32.  During the 14-month negotiations that ensued over that purchase, the Tribal Council held fast to three goals:  (1) bringing the services provided by MacFarlane Group under the AWL umbrella in order to eliminate existing third-party payments and increase revenue to the Tribe, (2) retaining sufficient expertise from MacFarlane Group to permit a smooth transition to complete tribal ownership, and (3) building the foundation for the Tribe to run every aspect of the business.  *Id.*

In October 2016, the Tribe and Curry finalized a deal under which the Tribe acquired MacFarlane Group.  Shotton Decl. ¶ 34.  The Tribal Council accomplished this by approving a

merger of its entity Red Stone, Inc. and MacFarlane Group, out of which Red Stone was the surviving company. *Id.* ¶¶ 34-35. AWL subsequently acquired MacFarlane Group's assets from Red Stone. *Id.* ¶ 36.[4]

The purchase of MacFarlane Group accomplished each of the Tribal Council's goals. For example, the Tribe eliminated many of the fees it previously paid for various lending services, thus increasing the profits that inured to the Tribe. Shotton Decl. ¶ 36. As part of the transaction, moreover, Curry and other MacFarlane Group employees, many of whom were experts in critical areas like loan servicing, information technology, and human resources, became employees of AWL and thereby employees of the Tribe. *Id.* ¶ 37. Tribal employees now perform nearly all aspects of AWL's lending business, including establishing underwriting criteria; approving and originating loans; operating the call center; collecting payment; and managing marketing, accounting, human resources, risk/analytics, and information technology. *Id.* ¶ 38. Retaining the former MacFarlane Group employees, including Curry as CEO, also ensured continuity in business operations and provided the Tribe with adequate support as it grew into its newly acquired company. *Id.* ¶ 37. Finally, the Tribe arranged for seller financing of the transaction by negotiating a five-year note to be paid out of AWL's profits. *Id.* ¶ 33. Once the loan is repaid, the Tribe expects to receive substantially more revenue from AWL (beyond the increase already experienced following the MacFarlane Group acquisition). *Id.*

In connection with the MacFarlane Group acquisition, the Tribal Council renamed American Web Loan, Inc. as AWL, Inc. Shotton Decl. Ex. J § 103. AWL, Inc.'s 2016 articles

---

[4] Red Stone, like AWL, is wholly owned by the Tribe. Shotton Decl. Ex. H. And also like AWL, Red Stone was created for "the purpose of providing revenues with which the [Tribe] may address other pressing matters of public health, safety, and welfare, or other Tribal purposes." Shotton Decl. Ex. I art. 2.

of incorporation again emphasize that AWL's "sole purpose is to generate long-term and sustainable revenue . . . so that the Tribal Council may better provide essential government services to the Tribe's Membership." *Id.* § 204.   As before 2016, the Tribe remains the business's sole shareholder.  *Id.* § 401.  The articles also provide AWL with immunity from suit, in order "[t]o protect the limited and irreplaceable AWL assets from large and unwarranted judgments, and to safeguard Trib[al] self-governance." *Id.* § 302.  And they direct AWL's board to "at all times endeavor to manage and operate AWL with the objective of minimizing expenses and maximizing dividends to the Tribe." *Id.* § 505(C).   In keeping with that direction, the articles limit the distribution of AWL revenues to (1) "settl[ing] outstanding AWL Obligations," (2) "mak[ing] dividend payments to the [Tribe]" and (3) donating to charitable organizations. *Id.*

The Tribal Council selected AWL's initial board of directors through legislative action, equally dividing the board between tribal officials and industry experts.  Shotton Decl. ¶ 40.  In the event of a deadlock among directors, the articles of incorporation require mediation by an independent, mutually agreed-upon mediator.  Shotton Decl. Ex. J § 711(C).  However, deadlock has never occurred; in fact, the board almost always makes decisions unanimously.  Shotton Decl. ¶ 41.

### D.   Revenue From AWL

As explained, all of AWL's profits inure to the Tribe, providing it with a large and consistent revenue stream.   Shotton Decl.  ¶ 42.   Some of the money goes to repairing, maintaining, and replacing tribal infrastructure.  *Id.* ¶ 43.  This investment is long overdue, in that many buildings on the reservation were sorely in need of repair because they were constructed in the 1970s and 1980s, when the Tribe could not afford to maintain them.  *Id.*  AWL revenues have made this possible.  *Id.*  In the first two years of AWL's business, moreover, the Tribe used AWL revenue to build 20 homes on the reservation.  *Id.* ¶ 44.  When opportunities

9

arise, the Tribe also buys back land within its jurisdiction—another step that was not possible before its treasury was supplemented with revenue from AWL. *Id.* ¶ 45. Lending proceeds have also funded the construction of a new building for the Tribe's Head Start participants. *Id.* ¶ 47.

The Tribe provides members in need with anything from eyeglasses and school clothes to a home and a college education. Shotton Decl. ¶ 46. For example, members can apply to the Tribal Council for a $10,000 grant for a down payment on a new home. *Id.* ¶ 43. College students can apply for grants to fund their university expenses; in most cases, the Tribe can cover the costs that remain after scholarships and federal grants, allowing students to attend public universities at no cost to them. *Id.* ¶ 46. Revenue from lending has allowed the Tribe to expand this benefit to graduate school programs as well. *Id.* The Tribe also runs a daycare, which serves around 35 children, and provides employment training, including assistance in obtaining GEDs and hosting training classes for commercial driver's licenses. *Id.* ¶¶ 46, 48. And the Tribe invests in preserving its unique culture, including through language-revitalization programs. *Id.* ¶ 49.

The revenue the Tribe expects to receive from AWL in the coming years will continue providing these services—and others. Dozens of members, for example, remain on the waitlist for tribal housing. Shotton Decl. ¶ 50. Similarly, while the Tribe funds members' medical needs, it needs to build its own health clinic, as members must now travel over 20 miles for healthcare services. *Id.* A substance-abuse treatment center would also provide much-needed support for the Tribe's members battling addiction. *Id.* Additionally, the Tribe needs to build both a homeless shelter and a shelter for children who have been removed from their homes. *Id.* These and other improvements would not be possible without AWL's revenue—revenue that, as

explained, must be used (setting aside charitable contributions) to fund the Tribe or to help its members.

## LEGAL STANDARD

A governmental defendant's sovereign immunity deprives courts of subject-matter jurisdiction. *Smith v. Washington Metropolitan Area Transit Authority*, 290 F.3d 201, 205 (4th Cir. 2002) (citing *Medina v. United States*, 259 F.3d 220, 223 (4th Cir. 2001)). This is as true of tribal immunity as of other forms of sovereign immunity. *See E.F.W. v. St. Stephen's Indian High School*, 264 F.3d 1297, 1302-1303 (10th Cir. 2001). In resolving a Rule 12(b)(1) motion, "the court may consider the evidence beyond the scope of the pleadings to resolve factual disputes concerning jurisdiction." *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995). The allegations in the complaint, moreover, are not entitled to any "presumption of truthfulness." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017).

## ARGUMENT

### DISMISSAL OF PLAINTIFFS' CLAIMS IS REQUIRED BECAUSE AWL ENJOYS TRIBAL SOVEREIGN IMMUNITY

#### A. Consistent With Principles Of Tribal Self-Governance, Sovereign Immunity Extends To An "Arm Of The Tribe" Engaged In Commercial Activity

From the early years of the United States, the Supreme Court has recognized Indian tribes as "distinct, independent political communities, retaining their original natural rights, as the undisputed possessors of the soil, from time immemorial." *Worcester v. Georgia*, 31 U.S. 515, 559 (1832). Tribes thus possess an inherent sovereignty that predates the U.S. Constitution, and they exercise this sovereignty by enacting laws and regulations, fostering relationships with other sovereigns (states and the federal government), preserving cultural identity, and improving their

economies and the well-being of their citizens.  *See generally Williams v. Lee*, 358 U.S. 217 (1959); *Santa Clara Pueblo*, 436 U.S. at 55-56.[5]

One of the fundamental components of tribal sovereignty is immunity from suit. Recognized as "part of American jurisprudence for well over a century," it is now established that tribes possess immunity against unconsented suit.  *Bay Mills*, 134 S. Ct. at 2040 (Sotomayor, J., concurring) (citing *Parks v. Ross*, 52 U.S. 362 (1851), and secondary sources).  This immunity is "a necessary corollary to Indian sovereignty and self-governance."  *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering*, 476 U.S. 877, 890 (1986). Subjecting a tribe to suit without its consent interferes with the tribal government's authority, threatening the tribe's "ability to govern itself according to its own laws," *id.* at 891, and its economic well-being, *Santa Clara Pueblo*, 436 U.S. at 71.

Tribal immunity extends to commercial as well as governmental actions, and to both on- and off-reservation activities.  *See Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 755 (1998); *see also Bay Mills*, 134 S. Ct. at 2031.  It also extends beyond tribes themselves, to "arms of the tribe," i.e., tribal entities that conduct commercial activity.  *See Thomas v. Dugan*, 168 F.3d 483, at *1 (4th Cir. 1998) (per curiam); *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010); *Memphis Biofuels, LLC v. Chickasaw Nation Industries, Inc.*, 585 F.3d 917, 920-921 (6th Cir. 2009); *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046 (9th Cir. 2006); *Hagen v. Sisseton-Wahpeton Community College*, 205 F.3d 1040, 1043 (8th Cir. 2000); *Ninigret Development Corp. v. Narragansett Indian Wetuomuck Housing Authority*, 207 F.3d 21, 29 (1st Cir. 2000).

---

[5] Congress can abrogate tribal sovereign immunity, but its intent to do so must be "unequivocally expressed."  *Santa Clara Pueblo*, 436 U.S. at 58.  There is no suggestion that Congress has done so here.

Extending immunity to arms of the tribe that conduct commercial activities is consistent with the purposes of tribal immunity.  Tribal business operations "are critical to the goals of tribal self-sufficiency because such enterprises . . . 'may be the only means by which a tribe can raise revenues.'"  *Bay Mills*, 134 S. Ct. 2036 (Sotomayor, J., concurring) (quoting Catherine T. Struve, *Tribal Immunity and Tribal Courts*, 36 Ariz. St. L. J. 137, 169 (2004)).  Indeed, federal policy for the past few decades has been to encourage tribal economic development, with the goal of decreasing tribal dependence on federal funding.  *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 217 n.20 (1987) ("'It is important to the concept of self-government that tribes reduce their dependence on Federal funds by providing a greater percentage of the cost of their self-government.'").

**B.     AWL Is An Arm Of The Otoe-Missouria Tribe Entitled To Sovereign Immunity**

To evaluate whether an entity qualifies as an arm of a tribe, courts within this circuit have relied on the *Breakthrough* test.  *See Howard v. Plain Green, LLC*, 2017 WL 3669565 at *3-6 (E.D. Va. Aug. 7, 2017); *report and recommendation adopted*, 2017 WL 3669096 (E.D. Va. Aug. 24, 2017); *Everette v. Mitchem*, 146 F. Supp. 3d 720, 723-725 (D. Md. 2015).  That test looks at six factors:  (1) the entity's method of creation, (2) its purpose, (3) the entity's structure, ownership, and management, including the amount of control the tribe has over it, (4) whether the tribe intended it to have tribal sovereign immunity, (5) the financial relationship between the tribe and the entity, and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entity.  *Breakthrough*, 629 F.3d at 1181.

Applying these factors leaves no doubt that AWL is an arm of the Tribe—that is, "the relationship between the tribe and [AWL] is sufficiently close to properly permit [AWL] to share in the tribe's immunity," *Breakthrough*, 629 F.3d at 1183.  Indeed, one court in this district has

already applied the *Breakthrough* test to determine that a tribal lending entity qualified as an arm of its respective tribe entitled to sovereign immunity. *See Howard*, 2017 WL 3669565, at *1. Specifically, the court held that it lacked jurisdiction over claims against Plain Green, LLC, a lending company formed by a federally recognized tribe, because Plain Green promoted the tribe's general welfare by increasing tribal revenues; serving the tribe's social, economic, educational, and health needs; and enhancing its economic self-sufficiency and self-determination. *Id.*; *see also Everette*, 146 F. Supp. 3d at 721-722 (dismissing claims against MobiLoans and Riverbend Cash, online lending companies owned by federally recognized tribes and formed under tribal law to raise revenue for the tribes). For similar reasons, the same result is warranted here.

### 1.    *The Tribal Council Created AWL Under Otoe-Missouria Law*

The first *Breakthrough* factor is how the tribal entity at issue was created. *See* 629 F.3d at 1191-1192. AWL was created by resolution of the Otoe-Missouria Tribal Council under the Tribe's Corporations Act, and to this day it operates pursuant to tribal law, including the Tribe's Consumer Financial Services Ordinance. Shotton Decl. Ex. D, Ex. B § 4.3. This factor therefore weighs in favor of immunity. *See Howard*, 2017 WL 3669565, at *3 (so holding after noting that "Plain Green was formed by the Tribe's governing body under the laws of the Tribe" and "operates pursuant to tribal law"); *Everette*, 146 F. Supp. 3d at 724 (same).

### 2.    *AWL's Purpose Is To Fund Essential Government Programs*

AWL's founding documents and other Otoe-Missouria laws make clear that AWL's animating purpose is to fund and otherwise strengthen the Tribe. The second *Breakthrough* factor—which evaluates whether a tribal entity was founded for the financial benefit of the Tribe or to permit it to perform governmental functions, *see* 629 F.3d at 1192—therefore also favors immunity here. *See Howard*, 2017 WL 3669565, at *3 (second factor supported immunity

where the lending entity was created "for the tribe's financial benefit"); *Everette*, 146 F. Supp. 3d at 724 (similar, where "the tribes created the companies to financially benefit the tribes and fund governmental services").

As discussed, the Tribal Council established AWL "for the purpose of providing revenues with which the Tribe may address other pressing matters of public health, safety, and welfare, or other tribal purposes."  Shotton Decl. Ex. D § 201.  The Council also imposed a separate limitation on the use of those funds, making clear in the Tribal Consumer Financial Services Ordinance that lending revenues could be used (setting aside charitable contributions) only for a limited set of *governmental* purposes.  *See* Shotton Decl. Ex. B § 1.3(a).  Those purposes are almost identical to the purposes for which tribal gaming revenue can be used under federal law.  *See* 25 U.S.C. § 2710(b)(2)(B).  Thus, not only was AWL established "for the financial benefit of the Tribe," *Breakthrough*, 629 F.3d at 1192, but those financial benefits are actually going to governmental purposes, such as "develop[ing] the tribe's economy, fund[ing] its governmental services, or promot[ing] cultural autonomy," *People ex rel. Owen v. Miami Nation Enterprises*, 386 P.3d 357, 372 (Cal. 2016).

> 3.    *The Tribe Controls AWL*

The Tribe is AWL's sole shareholder, operator, and regulator; it therefore "controls" the business within the meaning of the third *Breakthough* factor.  629 F.3d at 1191.  It does so in several ways.  First, the Tribal Council selected AWL's board of directors through legislative action, equally dividing the board between tribal officials and industry experts.  Shotton Decl. ¶ 40.  This means that at least one of the Tribe's appointees must consent before the board can take any significant actions affecting AWL.  Second, the Tribe owns AWL's only share.  Shotton Decl. Ex. J § 401; *see Howard*, 2017 WL 3669565, at *4 (the lender's "structure, ownership, and management" supported immunity because it was "wholly-owned by the Tribe through a holding

company"); *Everette*, 146 F. Supp. 3d at 724 (same, for that case's tribal lender).   As AWL's sole shareholder, the Tribe may amend AWL's Articles of Incorporation, and exercise other powers specified in those Articles.   Shotton Decl. Ex. J §§ 401, 1202.   Third, the Tribe's Consumer Financial Services Regulatory Commission—a governmental subdivision of the Tribe—oversees AWL's conduct using its licensing, supervisory, and enforcement powers. Shotton Decl. Ex. B § 7.13.   The Commission's regulatory control has been recognized outside the Tribe, including by Oklahoma's attorney general.   Shotton Decl. Ex. C.   All this easily suffices under the third *Breakthrough* factor because "control" under that factor does "not mean control of business minutiae; the tribe can be enmeshed in the direction and control of the business without being involved in the actual management."   *Owen*, 386 P.3d at 373 (quoting *Gavle v. Little Six, Inc.*, 555 N.W.2d 284, 295 (Minn. 1996)).   As just explained, the Tribe is amply "enmeshed" in the direction and control of AWL.

Plaintiffs' contrary argument rests on their suggestion that whatever control the Tribe exercises over AWL is "merely a front" for Mark Curry.   *See, e.g.*, Compl. ¶¶ 30-35.   That is simply false—and as noted, in the context of this motion the allegation need not be blindly credited.   Far from being a mere "front," AWL is an active corporation.   *See, e.g.*, Shotton Decl. ¶ 28.   Since the Tribe acquired MacFarlane Group in 2016, moreover, many of the services that were previously outsourced are now performed by employees of the Tribe.   *Id.* ¶ 38.[6]

---

[6] Only AWL's current relationship to the Tribe is relevant to the immunity analysis.  *See Owen*, 386 P.3d at 375 (relying on present corporate relationships for purposes of the arm-of-the-tribe inquiry); *Colorado v. Cash Advance*, 2012 WL 3113527 (Colo. Dist. Ct. Feb. 18, 2012) (emphasizing that, for purposes of performing arm-of-the-tribe analysis, "[w]hat matters is whether the tribes now own and operate the entities, not whether they owned and operated them at any other time").  *Cf. Straub v. AP Green, Inc.*, 38 F.3d 448 (9th Cir. 1994) (holding in the closely analogous foreign-sovereign-immunity context that a corporate defendant is immune from suit if it is currently an arm of a foreign state, regardless of its status at the time of the

The fact that MacFarlane Group previously provided AWL certain services provides no basis for denying tribal sovereign immunity. Tribes have long relied on similar arrangements, for example, in the gaming industry, yet courts have not held that those arrangements strip a tribal gaming entity of its arm-of-the-tribe status. To the contrary, the Tenth Circuit upheld a tribal tobacco company's sovereign immunity even though it had retained a non-Indian company to manage its business. *Native American Distributing v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288, 1296 (10th Cir. 2008); *see also, e.g.*, *Cabazon Band of Mission Indians v. Riverside*, 783 F.2d 900, 901 (9th Cir. 1986), *aff'd sub nom. California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987) (recognizing casino was run by "non-Indian professional operators, who receive[d] a percentage of the profits"). Indeed, the Tribe itself contracted for assistance from non-Indian entities when it first entered the gaming business. It needed financing and operational assistance when it entered the industry, and secured both a loan and casino-management expertise from an outside company. Shotton Decl. ¶ 21. After gaining a few years of experience, the Tribe ended its relationship with the management company and hired that company's recommended manager as an employee of the Tribe. *Id.* That decision allowed the Tribe to bring more aspects of the gaming business in-house, thereby increasing its returns. *Id.*

What *Native American Distributing*, *Cabazon*, and other similar decisions recognize is that using outside vendors is commonplace business activity—including among state government-owned enterprises. For example, New York City's comptroller recently sought to hire an investment-management firm to manage portions of the city's retirement and pension funds. *See* Solicitation:  Emerging Markets Equity Active Investment Management Services,

---

underlying conduct); *Belgrade v. Sidex International Furniture Corp.*, 2 F. Supp. 2d 407, 414 (S.D.N.Y. 1998) (same).

145 New York City Record 833, 839 (Feb. 15, 2018), http://www.nyc.gov/html/dcas/downloads/pdf/cityrecord/cityrecord-02-15-18.pdf. Similarly, most state governments that operate a lottery sell tickets through independently owned retailers. That includes Oklahoma, which operates a lottery that, although designed to benefit the public education system, depends on "a statewide network of lottery retailers," each of which is compensated "in the form of commissions" on gross sales. Okla. Stat. Ann. Title 3A, §§ 702, 717. Despite this use of outside vendors, no court has questioned state lotteries' sovereign status; in fact, multiple courts have upheld their immunity from suit. *E.g.*, *Curcio v. Department of Lottery*, 164 So. 3d 750, 754 (Fla. Ct. App. 2015); *Seneca One, LLC v. Geulakos*, 38 N.E.3d 307, 442-445 (Mass. App. Ct. 2015); *Janis v. California Lottery Commission*, 68 Cal. App. 4th 824, 829-831 (1998). The same result should obtain here.

4.      *The Tribe Intended To Share Its Immunity With AWL*

The fourth *Breakthrough* factor is whether the Tribe intended to share its sovereign immunity with the tribal entity. 629 F.3d at 1193-1194. In considering this factor, courts typically look to tribal ordinances or the entity's articles of incorporation. *See Howard*, 2017 WL 3669565, at *4 (finding this factor "unequivocally" met where articles of organization expressly conferred sovereign immunity on lending entity); *Everette*, 146 F. Supp. 3d at 725 (noting language explicitly conferring sovereign immunity in entity charter, operating agreement, and articles of organization). This factor is satisfied here. In fact, plaintiffs appear to concede the point, suggesting that sovereign immunity was what motivated the Tribe to form AWL in the first place. Compl. ¶ 2.

The Tribe has consistently expressed its intent that AWL share its sovereign immunity—beginning with the 2010 ordinance creating AWL, which provides that "[n]othing in this Act shall be construed as a waiver of any sovereign immunity afforded to . . . AWL," Shotton Decl.

Ex. D § 401.  That same intent is evinced by the Tribe's Consumer Financial Services Ordinance, which states that lenders licensed by the Tribe "possess all the privileges and immunities of the Tribe allowed under Tribal and federal law, including sovereign immunity from suit in any Tribal, Federal, or state court."  Shotton Decl. Ex. B § 7.6(a).  The Tribal Council reaffirmed this objective in a recent amendment to its Corporations Act, which makes clear that a corporation wholly owned by the Tribe and incorporated under tribal law "shall be considered an arm and instrumentality of the Tribe, and shall be vested with all attributes of tribal sovereignty."  Shotton Decl. Ex. F § 1301.  Finally, the most recent AWL Act reiterates the Tribe's intent to "cloak[]" AWL "with all the privileges and immunities of the Tribe . . . including Sovereign immunity from suit."  Shotton Decl. Ex. J § 302.

5.   *The Tribe Depends On AWL's Revenue For Essential Government Services And Benefits*

As discussed, *see supra* pp. 9-10, AWL provides the Tribe with substantial funds that are critical to the Tribe's government and its social programs.  Because the Tribe thus depends on AWL "for revenue to fund its governmental functions, its support of tribal members, and its search for other economic development opportunities," *Breakthrough*, 629 F.3d at 1195, the fifth factor also favors immunity.  *See Everette*, 146 F. Supp. 3d at 725 (fifth factor satisfied where revenue was used "to fund the provision of government services").

The substantial funds that AWL provides have allowed the Tribe to expand a number of the government services and benefits it offers.  Shotton Decl. ¶¶ 42-49.  Revenue from AWL helps fund the Tribe's services and programs relating to infrastructure, housing, education, job training, and more.  Put simply, lending provides the Tribe with the possibility of economic stability after a prolonged struggle with poverty.

Plaintiffs' allegation that the Tribe receives only 1% of AWL revenue, *e.g.*, Compl. ¶ 35, is both untrue and irrelevant to this factor, which looks not a business's profit margins, but at profits, and specifically at whether "profits inure to the benefit of the Tribe." *Howard*, 2017 WL 3669565, at *4. If instead the arm-of-the-tribe inquiry focused on matters such as profit margins or total dollar amounts, it would amount to nothing more than an analysis of whether the business is sufficiently successful from an economic standpoint. A struggling tribal enterprise that fails to turn a profit would lose its arm-of-the-tribe status even if failure to turn a profit was simply due to macroeconomic conditions beyond the tribe's control. Nothing in law or policy dictates such a result.

The 2016 AWL Act provides that the AWL board of directors "shall at all times endeavor to manage and operate AWL with the objective of minimizing expenses and maximizing dividends to the Tribe," and it limits AWL to distributing revenue to "settle outstanding AWL Obligations," "make dividend payments to the Shareholder" (the Tribe), or make charitable donations. Shotton Decl. Ex. J § 505(C). AWL's *profits* therefore "inure to the Tribe's benefit" because its "capital surplus . . . shall be deposited in the Tribe's treasury and because the Tribe, as the sole shareholder, enjoys all of the benefits of an increase in . . . value." *Cook v. AVI Casino Enterprises, Inc.*, 548 F.3d 718, 726 (9th Cir. 2008); *see also Howard*, 2017 WL 3669565 at *4. That is what matters under this factor.

6.    *Recognizing AWL's Immunity From Suit Protects Tribal Self-Determination And Promotes Tribal Economic Development*

The final *Breakthrough* factor, which examines the purposes of tribal sovereign immunity, also weighs in favor of treating AWL as an arm of the Tribe. Extending the Tribe's immunity here serves at least two of those purposes: protecting tribal self-determination by

promoting economic development, and protecting the Tribe's treasury.  *See Breakthrough*, 629 F.3d at 1188, 1195.

As explained, AWL "promotes economic development and self-sufficiency" for the Tribe, thereby accomplishing "a central purpose underlying tribal immunity."  *Howard*, 2017 WL 3669565, at *4 (citing *Kiowa Tribe*, 523 U.S. at 757).  The money the Tribe earns from consumer lending is invested in the Tribe's future, increasing the potential the Tribe will one day be able to rely less on federal funding for basic government operations.  Shotton Decl. ¶ 51. AWL also promotes economic development by promoting commercial dealings between the Tribe and non-Indians—its relationships with non-tribal vendors and customers being the two most obvious examples.  *See Howard*, 2017 WL 3669565, at *4.

Without AWL's revenue, the Tribe would be forced to curtail critical social programs on which its members depend, and to abandon the legislative priorities its Tribal Council has established in furtherance of tribal self-determination.  Because the Tribe is the sole owner of AWL, "there is no question" that the economic advantages provided by AWL "inure to the benefit of the Tribe" and that immunity "directly protects the sovereign Tribe's treasury."  *Allen v. Gold Country Casino*, 464 F.3d 1044, 1047 (9th Cir. 2006) (citing *Alden v. Maine*, 527 U.S. 706, 750 (1999)).  To interfere with the Tribe's limited means of economic development would therefore not only devastate the Tribe's economy, but also violate one of the most fundamental tenets of tribal sovereignty:  the right of a tribe to provide for its people.[7]

---

[7] It is also noteworthy that the manner in which the Tribe established AWL, by seeking outside investment and technical expertise, is consistent with current federal Indian policy of self-determination.  Congress has emphasized that "the twin goals of economic self-sufficiency and political self-determination for Native Americans can best be served by making available . . . the resources of the private market, adequate capital, and technical expertise."  Native American Business Development, Trade Promotion, and Tourism Act of 2000, Pub. L. No. 106-464 (Nov.

## C.     Red Stone Is Entitled To Sovereign Immunity

Red Stone, Inc. likewise shares the Otoe-Missouria Tribe's sovereign immunity. Plaintiffs do not allege or even suggest that the relationship between Red Stone and the Tribe is insufficiently close to permit Red Stone to share in the Tribe's sovereign immunity. For good reason: Like AWL, Red Stone satisfies each of the six *Breakthrough* factors. It was created by the Otoe-Missouria Tribal Council, and to this day it operates pursuant to tribal law. Shotton Decl. Ex. H. It was created "for the benefit of the Tribe" and for "the purpose of providing revenues with which the [Tribe] may address other pressing matters of public health, safety, and welfare, or other Tribal purposes." Shotton Decl. Ex. I art. 2. It is wholly owned by the Tribe, and the seven members of the Tribal Council serve as Red Stone's board of directors. Shotton Decl. Ex. H, Ex. I art. 4(a). The Tribe has also explicitly expressed its "intent to confer upon Red Stone[] all of the rights, privileges, and immunities . . . to the same extent the Tribe would have such rights, privileges and immunity." Shotton Decl. Ex. I art. 12. Any profits generated by Red Stone inure to the Tribe as its sole owner. Shotton Decl. Ex. H. Finally, granting immunity to Red Stone protects tribal self-determination by promoting economic development and protecting the Tribe's treasury. *See Breakthrough*, 629 F.3d at 1195.

The only reason plaintiffs provide for disregarding Red Stone's arm-of-the-tribe status is that by purchasing MacFarlane Group, a Nevada company, Red Stone somehow "voluntarily

---

7, 2000). To serve those "twin goals," Congress recognized an "obligation" on the part of the United States to "encourage investment from outside sources" in Indian businesses and to "facilitate economic ventures with outside entities that are not tribal entities." *Id.* Nowhere did Congress indicate that pursing these goals by employing non-Indians or relying on outside vendors would have any impact on the sovereign immunity of a tribal entity—understandably so, since that would risk undermining the very goals Congress sought to promote. Access to capital is, as Congress recognized, a critical predicate for tribal economic development; penalizing tribes like the Otoe-Missouria for pursuing one of the only meaningful options available to them to increase government revenue would decimate their potential for self-determination.

subject[ed]" itself to Nevada law, thus waiving its sovereign immunity.  Compl. ¶ 4 n.2.  Tribal sovereign immunity is not so easily lost.  A tribe can waive it by express statement, but not by implication.  *See Amerind Risk Management Corp. v. Malaterre*, 633 F.3d 680, 687 (8th Cir. 2011) (no waiver of sovereign immunity where arm of the tribe executed a general assumption of the "obligations and liabilities" of a non-tribal entity).  Even *Sommerlott v. Cherokee Nation Distributors, Inc.*, 686 F.3d 1144 (10th Cir. 2012), which plaintiffs cite for this proposition, does not go so far.  There, the Tenth Circuit considered an entity owned by the Citizen Potawatomi Nation but still incorporated under state law, and relied solely on the entity's jurisdiction of incorporation to conclude it did not share the tribe's sovereign immunity.  *Id.* at 1149.  MacFarlane Group, by contrast, ceased to exist after the merger.  Red Stone, the remaining entity, is incorporated under tribal law.  Its purchase of a company incorporated under Nevada law does not alter the conclusion that it is entitled to sovereign immunity.

*     *     *

In sum, each of the six *Breakthrough* factors supports the conclusion that AWL is an arm of the Otoe-Missouria Tribe, and thus immune from suit.

## CONCLUSION

Plaintiffs' claims against AWL, Inc., American Web Loan, Inc., and Red Stone, Inc. should be dismissed for lack of subject-matter jurisdiction.

April 18, 2018                              Respectfully submitted,

                                           AWL, INC., AMERICAN WEB LOAN, INC., and
                                           RED STONE, INC.

                                           By Counsel

                                    /s/

Charles K. Seyfarth (VSB No. 44530)
Elizabeth Scott Turner (VSB No. 88056)
O'HAGAN MEYER
411 East Franklin Street, Suite 500
Richmond, Virginia 23219
Phone: (804) 403-7137
Facsimile: (804) 403-7110
cseyfarth@ohaganmeyer.com
eturner@ohaganmeyer.com

Saba Bazzazieh (*pro hac vice* pending)
Robert Rosette (*pro hac vice* pending)
ROSETTE, LLP
1100 H Street, N.W., Suite 820
Washington, D.C. 20005
Phone: (202) 567-2941
Facsimile: (202) 525-5261
sbazzazieh@rosettelaw.com
rosette@rosettelaw.com

Thomas L. Strickland (*pro hac vice* pending)
Jonathan E. Paikin (*pro hac vice* pending)
Molly M. Jennings (*pro hac vice* pending)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Phone: (202) 663-6000
Facsimile: (202) 663-6363
thomas.strickland@wilmerhale.com
jonathan.paikin@wilmerhale.com
molly.jennings@wilmerhale.com

*Counsel for Specially-Appearing Defendants*
*AWL, Inc., American Web Loan, Inc., and*
*Red Stone, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

On this 18th day of April, 2018, I will electronically file the foregoing with the Court using the CM/ECF system, which will then send an electronic notification of such filing to all counsel of record.

By: ___/s/ Elizabeth Scott Turner_____
Charles K. Seyfarth (VSB No. 44530)
Elizabeth Scott Turner (VSB No. 88056)
O'HAGAN MEYER
411 East Franklin Street, Suite 500
Richmond, Virginia 23219
Phone: (804) 403-7137
Facsimile: (804) 403-7110
cseyfarth@ohaganmeyer.com
eturner@ohaganmeyer.com

*Counsel for Specially-Appearing Defendants*
*AWL, Inc., American Web Loan, Inc., and*
*Red Stone, Inc.*