IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

GEORGE HENGLE and LULA WILLIAMS,
on behalf of themselves and all
individuals similarly situated,

    Plaintiffs,

v.                       Civil Action No. 3:18-cv-100

MARK CURRY, et al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on the MOTION TO TRANSFER
TO THE NEWPORT NEWS DIVISION BY AWL, INC., AMERICAN WEB LOAN,
INC. AND RED STONE, INC. (ECF No. 3) and NATIONWIDE AWL CLASS
PLAINTIFFS' MOTION FOR LIMITED INTERVENTION (ECF No. 77) to join
the motion to transfer. AWL, Inc., American Web Loan, Inc.
(collectively, "AWL") and Red Stone, Inc. ("Red Stone"; with
AWL, collectively, "the AWL Defendants")[1] move to transfer this
action to the Newport News Division, where an action brought by
the putative intervenor plaintiffs—Royce Solomon, et al. v.

---

[1] American Web Loan appears to be a name under which AWL, Inc.
sometimes does business. Therefore, even if those companies are
different, see Compl. (ECF No. 1) ¶¶ 13-14, they can be referred
to as a single entity for purposes of this memorandum.
Similarly, although AWL and Red Stone must be distinguished for
the factual background here, they can be treated as a single
unit when considering the motion to transfer.

<u>American Web Loan, Inc., et al.</u>, No. 4:17-cv-145 ("<u>Solomon</u>")—is currently pending. For the reasons set forth below, both motions will be granted.

**BACKGROUND**

**A. Factual Background**

As alleged in the Complaint, Mark Curry ("Curry") was the "architect of [a] rent-a-tribe lending scheme" involving the Otoe-Missouria Tribe ("the Tribe") and an entity for which Curry was the chief executive officer, the MacFarlane Group. Compl. ¶ 12. At some point after 2009, Curry created the MacFarlane Group and associated with the Tribe in order to form AWL. Although the Tribe characterized AWL as an independent tribal lending entity, the Tribe allegedly had no control over AWL's income or expenses, and simply allowed Curry and the MacFarlane Group to use the entities as a front to offer illegal high-interest loans, in return for which the Tribe received a 1% flat fee of AWL's revenue. The money loaned was transferred from a bank account controlled by the MacFarlane Group, which tribal officials could not access. Then, after the loan agreements were executed, the MacFarlane Group accepted consumer payments directly, and the only funds that AWL or the Tribe ever received or handled was the specified revenue percentage. <u>Id.</u> ¶¶ 31-37, 40-41. The Tribe was similarly uninvolved in AWL's day-to-day

operations, which were mostly conducted by MacFarlane Group employees located outside the Tribe's reservation. Id. ¶¶ 38-39.

After AWL began operating, federal regulators began "cracking down" on lending entities connected with other tribes, and the New York Department of Financial Services issued a cease-and-desist letter regarding the Tribe's lending activities in New York. Curry subsequently sold the MacFarlane Group to Red Stone, a tribal entity, to insulate himself from any potential liability. Nonetheless, the Complaint alleges, Red Stone still operates in the same way as the MacFarlane Group—that is, with no role for the Tribe, and with substantial involvement by Curry. Id. ¶¶ 42-57.

The funding for AWL's scheme comes from Medley Capital Corporation ("Medley Capital") and its subsidiary, Medley Opportunity Fund II, LP ("Medley Fund"). Medley Capital allegedly created Medley Fund to allow investors to purchase interests in AWL's loans. Medley Capital then solicited third-party investments, and invested its own funds, in Medley Fund, which in turn provided the MacFarlane Group with the substantial capital underlying AWL's loans. Medley Fund continues to fund AWL today. Id. ¶¶ 59-67.

Curry intentionally chose Virginia as a place where AWL would offer loans and collect payments, notwithstanding his knowledge that the loans would be illegal under Virginia's usury

laws. The MacFarlane Group, through AWL, then began marketing, initiating, and collecting loans in Virginia. Consumers were required to electronically sign a form loan agreement created by Curry and the MacFarlane Group. Under the terms of that contract, the loans were subject to an annual percentage rate ("APR") that was much higher than 12%. However, neither the Tribe nor any of the defendants had a consumer finance license permitting them to charge interest at such a high rate, and they never attempted to obtain such a license. Id. ¶¶ 68-71, 74.

George Hengle ("Hengle") and Lula Williams ("Williams"; with Hengle, collectively, "Plaintiffs")—residents of the Richmond Division—both obtained loans from AWL. Hengle's loan was subject to an APR of 737.97%, and Williams' loan was subject to an APR of 593.12%. Because of those interest rates, Hengle and Williams paid $4,397.20 and $2,718.87, respectively, to AWL. Id. ¶¶ 72-73, 76-77.

## B. Procedural Background

On February 13, 2018, Plaintiffs brought suit against Curry, the AWL Defendants, Medley Fund, and Medley Capital. See Compl. (ECF No. 1). They asserted six class claims:

> (1) COUNT ONE, Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a), against Medley Fund and Medley Capital;

4

(2) COUNT TWO, Violations of RICO, 18 U.S.C. § 1962(b), against all defendants;

(3) COUNT THREE, Violations of RICO, 18 U.S.C. § 1962(c), against Curry and the AWL Defendants;

(4) COUNT FOUR, Violations of RICO, 18 U.S.C. § 1962(d), against all defendants;

(5) COUNT FIVE, Violations of Virginia Usury Laws, against all defendants; and

(6) COUNT SIX, Unjust Enrichment, against all defendants.

Id. ¶¶ 84-153. In the Civil Cover Sheet attached to the Complaint, Plaintiffs indicated that this case was related to another action pending before this Court, Lula Williams, et al. v. Big Picture Loans, LLC, et al., No. 3:17-cv-461 ("Williams"). ECF No. 1-4 at 1.

The AWL Defendants moved to transfer this action to the Newport News Division on February 21, 2018. ECF No. 3. Shortly thereafter, the Court requested statements from Plaintiffs and the AWL Defendants about why this case is related to Williams and Solomon, respectively. ECF Nos. 10, 11. After the parties had given their positions, the Court found that the case was related to Williams, but did not express any conclusion about its relation to Solomon. See ECF No. 75 at 2. The next day, Royce Solomon, Jodi Belleci, Michael Littlejohn, and Giulianna Lomaglio (collectively, "the Solomon Plaintiffs") moved to

intervene in support of the AWL Defendants' motion to transfer. ECF No. 77. The Court then granted Plaintiffs' request for jurisdictional discovery because some defendants had moved to dismiss the Complaint on grounds that implicated the Court's subject matter jurisdiction. ECF No. 76. Nonetheless, given the AWL Defendants' and Curry's subsequent motions to stay jurisdictional discovery, ECF Nos. 96, 98, it is unclear how much progress has been made in that regard. Finally, Plaintiffs recently moved to have their attorneys appointed as interim class counsel, which the AWL Defendants have responded to but not formally opposed. ECF Nos. 99, 102.

## C. Factual and Procedural Background in Solomon

The Solomon Plaintiffs filed suit against AWL, Curry, the MacFarlane Group, Medley Fund, Medley Capital, and eight other entities[2] in the Newport News Division on December 15, 2017. See ECF No. 1 (Docket No. 4:17-cv-145). They filed an amended complaint against AWL, Curry, the MacFarlane Group, Medley Fund, Medley Capital and eight other entities and individuals[3] on March

---

[2] Those other entities are SOL Partners ("SOL"); Oakmont Funding, Inc.; Dinero Investments, Inc.; Chieftain Funding, Inc.; Dant Holdings, Inc.; DHI Computing Service, Inc. ("GOLDPoint"); Smith Haynes & Watson, LLC; and Middlemarch Partners ("Middlemarch").

[3] Those other entities and individuals are SOL; Medley LLC; Medley Management, Inc.; Medley Group, LLC (with Medley Capital and Medley Fund, collectively, "the Medley Defendants"); Brook

6

9, 2018. See Solomon Am. Compl. (ECF No. 41, Docket No. 4:17-cv-145). That litigation is predicated on the same facts as this action. Specifically, the Solomon Plaintiffs allege that: (1) Curry worked with the Tribe to create AWL as a front to offer illegal high-interest loans; (2) AWL's lending process was almost entirely controlled by entities managed by Curry, including the MacFarlane Group, and the Tribe had little involvement in AWL's operations; (3) the Tribe received only 1% of the substantial revenues from AWL's lending scheme; (4) the Tribe's acquisition of the MacFarlane Group through Red Stone was a sham, as Curry continues to be heavily involved in AWL's lending operation; and (5) Medley Fund is primarily responsible for financing AWL's lending. See id. ¶¶ 81-126. AWL's lending process is also described in the same general terms as in this case, although the Solomon Amended Complaint focuses on the substance of AWL's loan agreements in much more detail, including their truth-in-lending disclosures and choice of law and arbitration provisions. See id. ¶¶ 127-37, 185-97. Although the Solomon Amended Complaint names eight defendants that are not defendants in this case, those defendants either provide services in support of AWL's lending operation or help Medley Capital and Medley Fund raise lending capital for AWL. See

Taube; Seth Taube (collectively, "the Taubes"); GOLDPoint; and Middlemarch.

id. ¶¶ 21-23, 26, 28-37. In other words, their inclusion as defendants is more reflective of the greater detail in the _Solomon_ Amended Complaint than of any difference between the key parties in _Solomon_ and this case.

The only significant factual contrast between the _Solomon_ Amended Complaint and the Complaint here is the composition of the proposed classes. Like Plaintiffs, the _Solomon_ Plaintiffs obtained loans from AWL and made payments in connection with those loans. Solomon also resides in Virginia, albeit in the Newport News Division, and the interest rate on his loan was 726.13%, well in excess of the maximum 12% APR permitted by Virginia law. Id. ¶¶ 10, 145. Belleci, however, is a Nebraska resident, and her interest rate of 595.06% exceeded the maximum 16% APR that Nebraska permits. Id. ¶¶ 11, 154-58. Littlejohn is a South Carolina resident who was charged an interest rate, 597.35%, above the relevant maximum of 12%. Id. ¶¶ 12, 166-68. Finally, Lomaglio is a California resident, and her 481.60% interest rate was higher than California's maximum 10% APR. Id. ¶¶ 13, 182-84. As a result, the _Solomon_ Plaintiffs allege their class claims on behalf of a putative nationwide class, instead of the limited Virginia classes claimed by Plaintiffs here. Compare id. ¶ 198 with Compl. ¶¶ 85-86.

The number and type of claims in _Solomon_ are also different. The _Solomon_ Plaintiffs assert nine class claims:

(1)  COUNT ONE, Violations of RICO, 18 U.S.C. § 1962(c), against American Web Loan, Curry, the MacFarlane Group, SOL, the Medley Defendants, and the Taubes;

(2)  COUNT TWO, Violations of RICO, 18 U.S.C. § 1962(d), against American Web Loan, Curry, the MacFarlane Group, SOL, the Medley Defendants, the Taubes, GOLDPoint, and Middlemarch;

(3)  COUNT THREE, Violations of the Electronic Funds Transfer Act ("EFTA"), against American Web Loan, Curry, the MacFarlane Group, SOL, the Medley Defendants, the Taubes, and GOLDPoint;

(4)  COUNT FOUR, Violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1638(a)(3), Failure to Disclose Finance Charge, against AWL, Inc.;

(5)  COUNT FIVE, Violations of TILA, 15 U.S.C. § 1638(a)(4), Failure to Disclose Finance Charge Expressed as an Annual Percentage Rate, against AWL, Inc.;

(6)  COUNT SIX, Violations of TILA, 15 U.S.C. § 1638(a)(5), Failure to Disclose the Total of Payments, against AWL, Inc.;

(7)  COUNT SEVEN, Violations of TILA, 15 U.S.C. § 1638(a)(6), Failure to Disclose Number,

Amount, and Due Dates or Period Payment Scheduled to Repay the Total of Payments, against AWL, Inc.;

(8) COUNT EIGHT, Violations of TILA, 15 U.S.C. § 1638(a)(1), Failure to Disclose the Identity of the Creditor, against AWL, Inc.;

(9) COUNT NINE, Unjust Enrichment, against all defendants.

Id. ¶¶ 209-76.

After the filing of the Solomon Amended Complaint on March 9, responsive motions were filed on April 8 and 9, and the Solomon Plaintiffs' responses are not due until June 8. ECF No. 92 (Docket No. 4:17-cv-145). No jurisdictional discovery has been conducted or, apparently, even requested. However, like Plaintiffs in this case, the Solomon Plaintiffs recently moved for the appointment of their attorneys as interim class counsel. ECF No. 100 (Docket No. 4:17-cv-145).

## DISCUSSION

### I.   Solomon Plaintiffs' Motion to Intervene

As noted, the Solomon Plaintiffs have moved to intervene for the limited purpose of joining the AWL Defendants' motion to transfer this action to the Newport News Division. Although Plaintiffs consent to the Solomon Plaintiffs' intervention, Pls. Intervention Resp. (ECF No. 91) at 1-2, the Court will briefly address the merits of the Solomon Plaintiffs' motion here.

The <u>Solomon</u> Plaintiffs seek to intervene under Fed. R. Civ. P. 24(a)(2). Under that provision, a court must permit intervention by any party that "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the [party]'s ability to protect its interest, unless existing parties adequately represent that interest." Alternatively, the <u>Solomon</u> Plaintiffs move to intervene under Rule 24(b), pursuant to which a court may permit intervention by anyone who "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). "In exercising its discretion [under Rule 24(b)], the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." <u>Id.</u> 24(b)(3).

The threshold issue for any intervention motion is whether that motion is timely. <u>See id.</u> 24(a), 24(b)(1). To determine whether a motion to intervene is timely, the Court must "assess three factors: first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the other parties; and third, why the movant was tardy in filing its motion." <u>Alt v. U.S. EPA</u>, 758 F.3d 588, 591 (4th Cir. 2014). "[T]he most important factor . . . is the prejudice caused to the other parties by the delay." <u>Hill Phoenix, Inc. v.</u>

11

Systematic Refrigeration, Inc., 117 F. Supp. 2d 508, 514 (E.D. Va. 2000). "The determination of timeliness is committed to the [Court's] sound discretion," which is "wide" in this context. Alt, 758 F.3d at 591 (internal quotations omitted).

If a motion to intervene is timely, the Court's "decision whether to grant permissive intervention is a matter 'within [its] sound discretion.'" In re Rivada Networks, 230 F. Supp. 3d 467, 472 (E.D. Va. 2017) (quoting Smith v. Pennington, 352 F.3d 884, 892 (4th Cir. 2003)). "'[L]iberal intervention is desirable to dispose of as much of the controversy involving as many apparently concerned persons as is compatible with efficiency and due process.'" Liberty Mut. Fire Ins. Co. v. Lumber Liquidators, Inc., 314 F.R.D. 180, 183 (E.D. Va. 2016) (alteration in original) (quoting Feller v. Brock, 802 F.2d 722, 729 (4th Cir. 1986)).

The Solomon Plaintiffs do not explain how they satisfy the elements for mandatory intervention under Rule 24(a)(2). Much of their briefing discusses why this action is not related to Williams, an issue that the Court has already decided. Even if the Court can vaguely discern why the Solomon Plaintiffs have an interest in this action that might be affected by the Court's decisions, given the Solomon Plaintiffs' involvement with Curry's alleged rent-a-tribe scheme, it is unclear why Hengle and Williams do not adequately represent that interest. Because

the Solomon Plaintiffs have failed to answer that question, they will not be permitted to intervene under Rule 24(a).

However, their request for permissive intervention stands on firmer ground. The similarities between this case and Solomon make it clear that the Solomon Plaintiffs have claims that share common legal and factual questions with Plaintiffs' claims. Fed. R. Civ. P. 24(b)(1)(B). Plaintiffs suggest that the motion to intervene is not timely because of the gap between the filing of the motion to transfer and the motion to intervene. But the explanation (or lack thereof) for the delay in moving to intervene is only one factor in the timeliness analysis. See Alt, 758 F.3d at 591; cf. Steves & Sons, Inc. v. JELD-WEN, Inc., 323 F.R.D. 553, 558 (E.D. Va. 2018) ("'[M]ere passage of time is but one factor to be considered in light of all the circumstances.'" (quoting Hill v. W. Elec. Co., 672 F.2d 381, 386 (4th Cir. 1982))). This action has not advanced past the pleading stage, and by consenting to intervention, Plaintiffs concede that they are not prejudiced in any way by intervention, especially in light of its limited purpose. For those same reasons, intervention would not unduly delay this litigation. It is admittedly unclear why the Solomon Plaintiffs must intervene instead of participating as amici curiae, see Lee v. Va. Bd. of Elections, No. 3:15CV357-HEH, 2015 WL 5178993, at *5 (E.D. Va. Sept. 4, 2015), but the former will allow them to comment on the

need for transfer slightly more effectively than the latter. Moreover, as noted, the Fourth Circuit generally takes a liberal approach towards permissive intervention. See Feller, 802 F.2d at 729.

The Solomon Plaintiffs have met the test for permissive intervention. Their motion is granted, and they are allowed to intervene for the sole purpose of joining in the AWL Defendants' motion to transfer. Accordingly, both the AWL Defendants' and the Solomon Plaintiffs' briefs may be considered in connection with the transfer motion.

## II.  AWL Defendants' Motion to Transfer

The AWL Defendants seek a transfer under 28 U.S.C. § 1404(a). That statute dictates that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."[4] Courts must answer two questions to resolve motions under this provision: "(1) whether the claims might have been brought in the transferee forum, and (2) whether the interest of justice and convenience of the parties and witnesses justify

---

[4] Although the AWL Defendants' motion concerns the more unique intra-district transfer, the plain language of Section 1404(a) indicates that the principles concerning transfers between districts apply equally to transfers between divisions.

14

transfer to that forum." Koh v. Microtek Int'l, Inc., 250 F.
Supp. 2d 627, 630 (E.D. Va. 2003); see also Glob. Touch Sols.,
LLC v. Toshiba Corp., 109 F. Supp. 3d 882, 889 (E.D. Va. 2015).

To satisfy the first facet of the test, "a movant must
establish that both venue and jurisdiction with respect to each
defendant is proper in the transferee district." Koh, 250 F.
Supp. 2d at 630. The second facet directs the court to assess
several factors, including: (1) ease of access to sources of
proof; (2) the convenience of the parties and witnesses; (3) the
cost of obtaining the attendance of witnesses; (4) the
availability of compulsory process; (5) the interest in having
local controversies decided at home; (6) in diversity cases, the
court's familiarity with the applicable law; and (7) the
interest of justice. Byerson v. Equifax Info. Servs., LLC, 467
F. Supp. 2d 627, 631 (E.D. Va. 2006). "While each of those
factors may be weighed, '[t]he principal factors to
consider . . . are plaintiff's choice of forum, witness
convenience, access to sources of proof, party convenience, and
the interest of justice.'" Id. at 632 (quoting Samsung Elecs.
Co., Ltd. v. Rambus, Inc., 386 F. Supp. 2d 708, 715 (E.D. Va.
2005)). No single factor is dispositive in the transfer
analysis, which is highly fact-dependent. Samsung Elecs., 386 F.
Supp. 2d at 716. As a result, courts have significant discretion
to decide transfer motions "according to an 'individualized,

15

case-by-case consideration of convenience and fairness.'" Id. at 715 (quoting Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988)). However, the movant "bears the burden of proving that the circumstances of the case are strongly in favor of transfer." Global Touch Sols., 109 F. Supp. 3d at 890 (emphasis in original) (internal quotations omitted). Thus, "transfer is not appropriate where it will only serve to shift the balance of inconvenience from one party to the other." Id. (internal quotations omitted).

A. **Propriety of Newport News Division as Transferee Forum**

The Section 1404(a) factors are only relevant if the AWL Defendants can show that all defendants in this action could be properly sued in the Newport News Division for their underlying conduct here. See Koh, 250 F. Supp. 2d at 630 ("[A] movant must establish that both venue and jurisdiction with respect to each defendant is proper in the transferee district." (emphasis added)); 15 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 3845 (4th ed. updated Apr. 2018) ("In suits against multiple defendants, transfer is proper only to a district in which all of them are subject to personal jurisdiction and in which venue is proper for an action against all of them.").

## 1. Venue

The federal venue statute allows civil actions to be brought in: (1) a district in which any defendant resides, if all defendants are residents of the state in which the district is located; (2) a district in which a "substantial part of the events . . . giving rise to the claim occurred"; or (3) a district in which any defendant is subject to the court's personal jurisdiction, if no district satisfies the first two options. 28 U.S.C. § 1391(b). The same rules apply for determining the appropriate division within the Eastern District of Virginia. E.D. Va. Civ. L.R. 3(C). Although the RICO statute also authorizes venue in certain districts, <u>see</u> 18 U.S.C. § 1965(a); <u>ESAB Grp., Inc. v. Centricut, Inc.</u>, 126 F.3d 617, 626 (4th Cir. 1997), that provision does not help the AWL Defendants here because it points to the districts where suit may be brought, and not to divisions within a district. Thus, Section 1965(a) would only show that the Eastern District of Virginia is a proper venue, not that either the Newport News or Richmond Divisions are proper. Moreover, Local Rule 3(C) specifically refers to Section 1391 alone, so there is no basis for relying on Section 1965 to determine the divisions in which venue may lie.

The AWL Defendants do not specify which part of Section 1391 makes venue in the Newport News Division proper for

Plaintiffs' claims. Because multiple defendants do not reside in Virginia, let alone the Newport News Division, see Compl. ¶¶ 12, 16-17, Section 1391(b)(1) cannot apply here. Consequently, the only plausible basis for venue is Section 1391(b)(2) (or (3), if no division is proper under subsection (2)). This action does not involve particular property, so the relevant question is whether "a substantial part of the events . . . giving rise to the claim occurred" in the Newport News Division. The AWL Defendants need not establish that the division "has the most substantial contacts to the dispute. Rather, it is sufficient that a substantial part of the events occurred in that venue, even if a greater part of the events occurred elsewhere." Power Paragon, Inc. v. Precision Tech. USA, Inc., 605 F. Supp. 2d 722, 726 (E.D. Va. 2008) (internal citation omitted). Accordingly, the Court must "review the entire sequence of events underlying [each] claim" and determine if part of that sequence occurred in the Newport News Division. Mitrano v. Hawes, 377 F.3d 402, 405 (4th Cir. 2004) (internal quotations omitted); see also Power Paragon, 605 F. Supp. 2d at 726.

Although the AWL Defendants' discussion of venue is limited, even a cursory review of the Complaint reveals that a substantial portion of the events underlying Plaintiffs' claims occurred in the Newport News Division. RICO claims under the various subparts of Section 1962 involve slightly different

elements, but the common denominator is the existence of an enterprise through a pattern of racketeering activity or collection of unlawful debt. See 18 U.S.C. § 1962(a)-(d); Field v. GMAC LLC, 660 F. Supp. 2d 679, 686 (E.D. Va. 2008). The collection of interest at an APR greater than 12% is also the focus of Plaintiffs' claim for violations of Virginia's usury laws, Compl. ¶¶ 141-43, so the locus of the RICO and usury claims is essentially identical for purposes of the venue analysis. In addition, to prove unjust enrichment under Virginia law, a plaintiff must show, inter alia, that he conferred a benefit on the defendant. See Schmidt v. Household Fin. Corp., II, 276 Va. 108, 116 (2008). In this case, the collection of the unlawful debt and the conferral of the benefit arise from the same act: a class member's payment of principal or interest on an allegedly usurious AWL loan. That act necessarily occurred wherever the class member was located when the payment was made. In addition, the payment of funds was made possible by the consumers' execution of loan agreements with AWL, an act that—given AWL's electronic loan process—also occurred where the class member was located. The putative class definition includes only those consumers who resided in Virginia when they executed their loan agreements with or made payments to AWL. See Compl. ¶¶ 85, 99, 111, 125, 135, 145. As the Solomon Amended Complaint illustrates, this class definition would include

Solomon, who resides in the Newport News Division, and there are doubtless numerous other consumers in that division who fall within Plaintiffs' putative class. Therefore, the AWL Defendants have demonstrated that a substantial part of the events giving rise to Plaintiffs' claims occurred in the Newport News Division, such that venue there would be proper.

## 2. Personal Jurisdiction

Whether the AWL Defendants have shown that every defendant here could be subject to personal jurisdiction in the Newport News Division based on Plaintiffs' claims is a more difficult question. The AWL Defendants' discussion of personal jurisdiction is not just limited, as was the case with venue; it is nonexistent. See AWL Reply (ECF No. 15) at 3-4. Given that failure to address the matter at all, unless it is obvious from the Complaint or otherwise undisputed that all defendants would be subject to personal jurisdiction in the Newport News Division, the AWL Defendants have not met their burden to show that transfer is permissible under Section 1404(a).

Rule 4(k) allows district courts to exercise personal jurisdiction over defendants in two circumstances that are pertinent here: (1) where a state court in the state where the district court is located could exercise personal jurisdiction over the defendant, Fed. R. Civ. P. 4(k)(1)(A); and (2) where authorized by a federal statute, id. 4(k)(1)(C). Both approaches

supply a possible basis for a court in the Newport News Division to exercise personal jurisdiction over the defendants here, but the results of each analysis differ.

### a. Virginia's Long-Arm Statute

Under Rule 4(k)(1)(A), "[a] federal district court may only exercise personal jurisdiction over a foreign [defendant] if such jurisdiction is authorized by the long-arm statute of the state in which it sits and application of the long-arm statute is consistent with the due process clause of the Fourteenth Amendment." Consulting Eng'rs. Corp. v. Geometric Ltd., 561 F.3d 273, 277 (4th Cir. 2009). Virginia's long-arm statute is coextensive with the limits of the Due Process Clause, so "the statutory and constitutional inquiries merge into the question of whether the . . . defendants had sufficient minimum contacts with Virginia to satisfy due process." D'Addario v. Geller, 264 F. Supp. 2d 367, 378 (E.D. Va. 2003).

That long-arm statute allows courts to

> exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:
>
> 1. Transacting any business in this Commonwealth;
>
> 2. Contracting to supply services or things in this Commonwealth;
>
> 3. Causing tortious injury by an act or omission in this Commonwealth; [or]

> 4. Causing tortious injury in this
> Commonwealth by an act or omission
> outside this Commonwealth if he
> regularly does or solicits business, or
> engages in any other persistent course
> of conduct, or derives substantial
> revenue from goods used or consumed or
> services rendered, in this
> Commonwealth;

Va. Code § 8.01-328.1(A). Those provisions must be read alongside the core due process requirement that a defendant "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotations omitted). Accordingly,

> when a defendant's contacts with the forum
> state are continuous and systematic,
> irrespective of whether the transaction in
> question had sufficient contacts with the
> state, a court may exercise general personal
> jurisdiction over the defendant. In the
> absence of continuous and systematic
> contacts, a court may still exercise
> specific personal jurisdiction when the
> contacts relate to the cause of action and
> create a substantial connection with the
> forum state.

Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners, 229 F.3d 448, 450 (4th Cir. 2000) (emphasis in original) (internal citation omitted).

The absence of any evidence from the AWL Defendants about their or the other defendants' conduct in Virginia makes it hard

to conduct a proper constitutional inquiry. It seems clear from the allegations in the Complaint—and the AWL Defendants appear to concede—that AWL, by operating its website, intentionally offered the purportedly usurious loans to consumers in Virginia, and then collected payments from those same consumers. Nonetheless, the frequency of those interactions is unknown, and there is no indication that AWL conducted further business in Virginia. Thus, it cannot be said that AWL's contacts with the Commonwealth were "'so continuous and systematic as to render [it] essentially at home'" here. Daimler AG v. Bauman, 571 U.S. 117, 139 (2014) (alteration in original) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011)). The AWL Defendants therefore have not shown that a court in the Newport News Division would have had general personal jurisdiction over AWL.

However, AWL could have been subject to specific personal jurisdiction within the limits of the Due Process Clause. AWL effectively reached into Virginia by soliciting consumers' loan applications, requiring individuals to complete applications and loan agreements on AWL's website, providing the consumers with loans, and collecting loan payments electronically. Those actions implicate several provisions of Virginia's long-arm statute: transacting business in the Commonwealth, contracting to supply things (loans) in the Commonwealth, and causing

tortious injury through an act in the Commonwealth (collecting loan payments through the website). Va. Code § 8.01-328.1(A)(1)-(3). Moreover, the claims asserted against AWL all arise from that conduct, since those claims involve the issuance of or collection on usurious loans offered by AWL in Virginia. This close connection demonstrates that AWL should have "reasonably anticipated being haled into court" in Virginia in connection with its actions, World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980); see also Diamond Healthcare, 229 F.3d at 450, and that subjecting AWL to jurisdiction in the Commonwealth is reasonable in light of the factors outlined in World-Wide Volkswagen, see 444 U.S. at 292. Consequently, a court in the Newport News Division could have exercised specific personal jurisdiction over AWL without offending due process.

However, the Court lacks enough information to assess general or specific jurisdiction as to the remaining defendants—Red Stone, Curry, Medley Capital, and Medley Fund. Those defendants are almost certainly not subject to general jurisdiction in Virginia: Curry appears to be domiciled in Puerto Rico, see Compl. ¶ 12; see also Daimler, 571 U.S. at 137; Red Stone appears to be incorporated and to have its principal place of business elsewhere, and likely is not "essentially at home" here, see Compl. ¶ 15; see also Daimler, 571 U.S. at 137, 139; and Medley Capital and Medley Fund are in the same position

as Red Stone, see Compl. ¶¶ 16-17. As for specific jurisdiction, although the Complaint references those defendants' activities, it is unclear whether they "'purposefully established minimum contacts in [Virginia],'" such that they should have anticipated being brought to court here in connection with AWL's lending operation. ePlus Tech., Inc. v. Aboud, 313 F.3d 166, 176 (4th Cir. 2002) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)). Thus, on this record, the Court cannot determine with any certainty the nature of those defendants' contacts with Virginia, essentially making the due process analysis a guessing game. For that reason, the AWL Defendants have failed to show that the non-AWL defendants could be subject to personal jurisdiction in the Newport News Division pursuant to Rule 4(k)(1)(A).

### b. RICO Statute

The jurisdictional analysis under Rule 4(k)(1)(C) is more straightforward. The RICO statute indicates that "[a]ll other process in any action . . . under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(d). The Fourth Circuit has held that this

provision authorizes nationwide service of a summons.[5] See ESAB Grp., 126 F.3d at 626. As a result, personal jurisdiction over a defendant with respect to RICO claims may be exercised anywhere in the United States, as long as the defendant was properly served under Section 1965(d) and exercising jurisdiction does not violate the Fifth Amendment. See Trs. of the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc., 791 F.3d 436, 443 (4th Cir. 2015) ("Plumbers & Pipefitters"); ESAB Grp., 126 F.3d at 627-28. For the Fifth Amendment to be implicated, a court's exercise of personal jurisdiction would have to "'result in such extreme inconvenience or unfairness as would outweigh the congressionally articulated policy evidenced by a nationwide service of process provision.'" Plumbers & Pipefitters, 791 F.3d

---

[5] This conclusion puts the Fourth Circuit in the clear minority. There is no dispute that RICO permits nationwide service of process, but most courts have held that Section 1965(b)—which authorizes nationwide service of a summons only if "it is shown that the ends of justice require that other parties residing in any other district be brought before the court"—grants such authority. See Sadighi v. Daghighfekr, 36 F. Supp. 2d 267, 272 (D.S.C. 1999); **U.S. Dep't of Justice, Civil RICO: A Manual for Federal Attorneys** 93-94 (2007), available at https://www.justice.gov/sites/default/files/usam/legacy/2014/10/17/civrico.pdf. The Fourth Circuit's reading effectively "eradicate[s] the 'ends of justice' inquiry by using [S]ection 1964(d) to acquire personal jurisdiction." D'Addario, 264 F. Supp. 2d at 386 n.22. Medley Capital and Medley Fund clearly disagree with ESAB Group, given their motions to dismiss for lack of personal jurisdiction in this case, ECF No. 54, and in Solomon, ECF No. 64 (Docket No. 4:17-cv-145). Nonetheless, ESAB Group has not been overruled, and the Court will not depart from its rationale here.

at 444 (quoting <u>Denny's, Inc. v. Cake</u>, 364 F.3d 521, 524 n. 2 (4th Cir. 2004)). "[W]hen a defendant is a United States resident, it is 'highly unusual . . . that inconvenience will rise to a level of constitutional concern.'" <u>Id.</u> (second alteration in original) (quoting <u>ESAB Grp.</u>, 126 F.3d at 627).

All defendants here operate in the United States, so they could presumably be served with process in a judicial district where they reside, are found, or transact their affairs.[6] Furthermore, there is no evidence that any defendant would suffer extreme inconvenience or unfairness from litigating in the Newport News Division. Defendants have conducted their business in connection with the underlying dispute in states like Oklahoma, Delaware, and New York. Even if there would be some inconvenience in having to defend the action in Virginia instead of one of those states, "it is not so extreme as to defeat the exercise of personal jurisdiction pursuant to valid service of process, although it may certainly factor into a transfer decision." <u>ESAB Grp.</u>, 126 F.3d at 627. Finally, the Complaint's allegations show that the RICO claims are

---

[6] Defendants were served with process in this case through the Virginia Secretary of State as their statutory agent. ECF No. 13; <u>see also</u> Va. Code § 8.01-329(A). But the provision allowing such service refers back to Virginia's long-arm statute, and whether all defendants could be subject to personal jurisdiction under that law is unclear. However, nothing in the record shows an impediment to appropriate RICO service on defendants.

"colorable"—that is, they are "'arguable and nonfrivolous, whether or not [they] would succeed on the merits.'" D'Addario, 264 F. Supp. 2d at 388 (quoting Davis v. Featherstone, 97 F.3d 734, 737-38 (4th Cir. 1996)). Consequently, a court in the Newport News Division could exercise personal jurisdiction over the defendants as to the RICO claims consistent with the Fifth Amendment. The doctrine of pendent personal jurisdiction would also permit that court to exercise jurisdiction over the closely-related usury and unjust enrichment claims. See ESAB Grp., 126 F.3d at 628.

For these reasons, venue would be proper in the Newport News Division, and personal jurisdiction could be exercised over all defendants by a court there. Accordingly, all of Plaintiffs' claims could have been brought in that division.

### B. Section 1404(a) Factors

Because the AWL Defendants have satisfied the first part of Section 1404(a), the Court must decide whether the convenience of the parties and witnesses and the interest of justice support a transfer. As noted, courts "consider four factor when deciding whether to transfer venue: (1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." Plumbers & Pipefitters, 791 F.3d at 444.

## 1. Plaintiffs' Choice of Forum

"[A] plaintiff's choice of venue is entitled to substantial weight in determining whether transfer is appropriate." Id. (internal quotations omitted). That choice is afforded less weight in the transfer analysis if the chosen venue is not the plaintiff's home forum, or if "the nucleus of operative facts" is not in that forum. Samsung Elecs., 386 F. Supp. 2d at 716. Even in that case, however, the plaintiff's choice is still relevant "so long as there is a connection between the forum and the plaintiff's claim that reasonably and logically supports the plaintiff's decision to bring the case in the chosen forum." Id.

Plaintiffs reside in the Richmond Division, Compl. ¶¶ 10-11, so this action is in their home forum. Because the acts allegedly constituting the RICO enterprise and the collection of unlawful debt may have occurred in a number of places, an obvious nucleus of operative facts does not present itself here. To the extent that there is one, it is most likely in the Western District of Oklahoma, where the AWL Defendants have their operations and where the Tribe is located. Nonetheless, as discussed at some length, AWL has clearly engaged in conduct in Virginia—including in the Richmond Division, as the loans obtained and paid by Plaintiffs reflect. Accordingly, this factor still weighs in Plaintiffs' favor even if the bulk of the underlying events happened elsewhere.

The AWL Defendants also contend that Plaintiffs' choice of forum should be given less weight because this case is a class action. The Court has recognized that "courts often give less weight to the plaintiff's choice of forum in class actions" because that type of case has "numerous possible plaintiffs, each possibly able to make a showing that a particular forum is best suited for the adjudication of the class' claim." Byerson, 467 F. Supp. 2d at 633 (internal quotations omitted). This factor still weighed against transfer in Byerson, though, because the Eastern District of Virginia was "home both to the [p]laintiffs and to key non-party witnesses." Id. Here, the Solomon Plaintiffs' filing of a very similar case in a different division in Virginia illustrates the precise concern expressed in Byerson. Unlike in Byerson, although the Richmond Division is Plaintiffs' home forum, the parties have not identified any non-party witnesses here, so the cost of discovery in the Newport News Division will not be appreciably more expensive than the cost here.[7] As a result this factor still weighs against transfer, but slightly less so than in Byerson.

---

[7] Plaintiffs argue that the cost of discovery is "not close," Pls. Opp. (ECF No. 12) at 11, apparently focusing on the cost of the consolidated litigation that might result if this action is transferred. But that argument improperly assumes that Judge Jackson—who is presiding over Solomon—will consolidate the two cases. The better comparison is between the cost of discovery here and in the Newport News Division if this case proceeds

30

## 2. Witness Convenience and Access to Evidence

Witness convenience is "of considerable importance" in deciding a motion to transfer. Samsung Elecs., 386 F. Supp. 2d at 718. This factor looks to which forum better enables witnesses to testify in person, as "live testimony is preferred to other means of presenting evidence." Id. In this analysis, the convenience of non-party witnesses takes priority over that of party witnesses. Id. Of course, courts cannot judge the relative convenience of different fora without evidence, so "'[t]he party asserting witness inconvenience has the burden to proffer, by affidavit or otherwise, sufficient details respecting the witnesses and their potential testimony to enable the court to assess the materiality of evidence and the degree of inconvenience.'" Id. (quoting Koh, 250 F. Supp. 2d at 636).

The AWL Defendants have not identified any witnesses that would be inconvenienced if this action proceeded in the Richmond Division instead of the Newport News Division, nor have they explained why transfer would otherwise improve the parties' access to evidence. In fact, they effectively concede that this factor does not support transfer, noting that "[n]either

---

independently. Moreover, even accepting Plaintiffs' premise, they ignore the substantial benefits of having witnesses common to this case and Solomon testify in one proceeding instead of in parallel actions in different courthouses. See Byerson, 467 F. Supp. 2d at 634-35.

Division presents any particular advantage for AWL or the witnesses that would be required to travel long distances to either location." AWL Reply at 5. This acknowledgement makes sense in light of the relatively short distance between the Richmond and Newport News Divisions.

That proximity, however, also undermines Plaintiffs' contentions regarding the greater convenience of litigating this action in the Richmond Division. Contrary to what Plaintiffs seem to believe, the key witnesses in this case are not Virginia consumers; they are the individuals who participated in or contributed to defendants' alleged RICO enterprise, none of whom appear to reside in Virginia. Assuming those witnesses are travelling from other states to Virginia, having them drive to the Newport News Division instead of the Richmond Division is not inconvenient. Likewise, the discovery that might be sought from Virginia state agencies in Richmond may be important, but it is hard to see how seeking that discovery from Newport News instead of Richmond makes the Richmond Division "plainly a much more convenient venue." Pls. Opp. at 11. Consequently, this factor is mostly neutral in the transfer analysis, although possibly weighing slightly against transfer.

### 3. Party Convenience

As the above discussion shows, transferring the case to the Newport News Division will not measurably affect the parties'

convenience. From the limited record available, the only reasonable conclusions at this point are that: (1) Plaintiffs, who are Richmond Division residents, will be inconvenienced slightly by having to travel to the Newport News Division; and (2) all defendants will benefit from a transfer because they will be able to defend this action and <u>Solomon</u> (in which they are effectively all named as defendants)[8] in one division instead of two. However, the AWL Defendants cannot prevail by showing that transfer will simply "shift the balance of inconvenience from one party to the other." <u>Glob. Touch Sols.</u>, 109 F. Supp. 3d at 890 (internal quotations omitted). Therefore, this factor weighs against transfer, even if minimally so.

### 4. Interest of Justice

This factor requires consideration of

> "public interest factors aimed at systemic integrity and fairness." Most prominent among the elements of systemic integrity are judicial economy and the avoidance of inconsistent judgments. Fairness is assessed by considering docket congestion, interest in having local controversies decided at home, knowledge of applicable law, unfairness in burdening forum citizens with jury duty, and interest in avoiding unnecessary conflicts of law.

---

[8] Red Stone is not a defendant in <u>Solomon</u>. However, the <u>Solomon</u> Amended Complaint names the MacFarlane Group as a defendant, and that entity was subsumed by Red Stone after merging with it, so Red Stone is functionally a defendant in that case.

Byerson, 467 F. Supp. 2d at 635 (internal citations omitted) (quoting Samsung Elecs., 386 F. Supp. 2d at 721). Systemic integrity "must also . . . take account of a party's attempt to game the federal courts through forum manipulation." Samsung Elecs., 386 F. Supp. 2d at 721. In some cases, "'the interest of justice may be decisive in ruling on a transfer motion even though the convenience of the parties and witnesses point in a different direction.'" Id. at 716 (quoting Wright & Miller, supra, § 3854); see also In re Vistaprint Ltd., 628 F.3d 1342, 1347 (Fed. Cir. 2010) ("[I]t is entirely within the district court's discretion to conclude that in a given case the § 1404(a) factors of public interest or judicial economy can be of paramount consideration, . . . even if the convenience factors call for a different result." (internal citation and quotations omitted)).

The parties do not discuss factors like docket congestion, interest in having local disputes decided at home, knowledge of applicable law, burdens of jury duty, or possible conflicts of law. Because the Newport News Division and the Richmond Division are in the same district, those facts are not implicated in any real way here. Instead, the AWL Defendants base their argument on the need for judicial economy and avoidance of inconsistent judgments given the litigation of a very similar proceeding, Solomon, in the Newport News Division. That case is relevant to

two issues that fall under the interest of justice heading: the existence of a related action in a different district, and the first-to-file rule. See Wenzel v. Knight, No. 3:14CV432, 2015 WL 222179, at *5 (E.D. Va. Jan. 14, 2015); Byerson, 467 F. Supp. 2d at 635; Samsung Elecs., 386 F. Supp. 2d at 721-24. Even though "the policies served by transfer are similar in both instances," those topics may be analyzed separately. Byerson, 467 F. Supp. 2d at 635. Thus, the Court will do so here.

### a. Related Action

Section 1404(a) is generally intended to avoid a "multiplicity of litigation resulting from a single transaction or event." Wright & Miller, supra, § 3854; see also Cont'l Grain Co. v. The FBL-585, 364 U.S. 19, 26 (1960) ("To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent."). Allowing related cases to proceed simultaneously on separate tracks creates a "prospect of inconsistent outcomes" that does not exist when the same court manages both cases. Samsung Elecs., 386 F. Supp. 2d at 721. Thus, "[t]ransfer and consolidation will serve the interest of judicial economy in most cases where the related actions raise similar or identical issues of fact and law." Id. As a result, "'[t]he interest of justice weighs heavily in favor of transfer

when related actions are pending in the transferee forum.'" _Wenzel_, 2015 WL 222179, at *3 (quoting _U.S. Ship Mgmt., Inc. v. Maersk Line, Ltd._, 357 F. Supp. 2d 924, 937 (E.D. Va. 2005)).

The AWL Defendants argue that the pendency of _Solomon_ in the Newport News Division is enough to counteract Plaintiffs' choice of forum and the convenience factors, all of which weigh against transfer to some degree. They point to the broad similarities between the underlying facts, claims, and defendants in both cases, asserting that one court should deal with the overlapping issues to avoid the confusion that could result from inconsistent rulings. Plaintiffs, however, contend that the differences between this case and _Solomon_ limit the extent to which transfer would serve the interest of justice. They also argue that the AWL Defendants' invocation of judicial economy is questionable because it merely conceals their desire to further transfer the litigation to the Western District of Oklahoma—a type of forum shopping that is inconsistent with the goals of Section 1404(a).

The obvious similarities between this case and _Solomon_ weigh in favor of transfer. As described above, both cases arise from the exact same factual background: Curry's engineering a rent-a-tribe scheme, associating with the Tribe to form AWL as a front for the MacFarlane Group's lending operation, relying on Medley Capital and Medley Fund to fund the loans, and selling

the MacFarlane Group to Red Stone once the threat of regulation or prosecution became more apparent. The claims are also largely the same, as both complaints allege RICO violations and some state law claims. In addition, given the common facts, many of the same legal issues will need to be resolved in both cases, including whether the AWL Defendants are protected by tribal sovereign immunity and whether the arbitration provisions in AWL's loan agreements are enforceable against the plaintiffs. And, of course, "it is essential to avoid any risk of inconsistent rulings on class action issues, such as composition of classes and sub-classes." Byerson, 467 F. Supp. 2d at 636. Consequently, "wholly apart from the first-to-file rule," it is best for one court to "assess the factors that point to factual and legal overlap and sort out the class action issues that will arise" in this case and in Solomon. Id.

The existence of some differences between the two cases does not outweigh the clear benefits of transferring this action. As noted, the additional defendants in Solomon are either functionally identical to a defendant in this case—as with the MacFarlane Group—or closely linked to multiple defendants in this case—as with SOL, the Medley Defendants, the Taubes, GOLDPoint, and Middlemarch. Similarly, although Solomon Plaintiffs assert EFTA and TILA claims that Plaintiffs here do not, the central claims of both cases are the RICO

claims based on collection of unlawful debt. Thus, "the similarities are more significant than . . . the differences" because the cases "involv[e] the same provision of federal law and the same basic conduct by," for the most part, the same defendants. Id. Finally, it is insignificant that the proposed class definition in Solomon concerns a nationwide class of consumers whereas the class definition here is limited to Virginia consumers.[9] Because the Solomon class definition includes Virginia consumers—indeed, one is a named plaintiff—any decision affecting that class will necessarily affect the putative class in this case. In light of this overlap, "a single district court hearing each of the related actions will be able to ensure that all consumers adversely affected by the practices

---

[9] Plaintiffs argue that the Court should not consider the proposed class definitions because the absence of certification makes that comparison premature. That is particularly important here, Plaintiffs say, because the Solomon class is overly broad and unlikely to be certified in its current form given the variations in states' usury laws. Yet that potential result is immaterial here; although at least one court has considered the likelihood of certification when deciding whether to stay a case based on the first-to-file rule, see Lac Anh Le v. Pricewaterhousecoopers LLP, No. C-07-5476 MMC, 2008 WL 618938, at *1 (N.D. Cal. Mar. 4, 2008), transferring a case because of a related action does not require the same commonality of parties that a stay on first-to-file grounds does, compare id. with Byerson, 467 F. Supp. 2d at 635-36. Moreover, this Court and others have treated proposed class definitions as a relevant factor in the transfer analysis, and the Fourth Circuit has not required a different approach. See Byerson, 467 F. Supp. 2d at 636; see also Wenzel, 2015 WL 222179, at *4. Consequently, the Court need not postpone its ruling on the transfer motion.

complained of will be protected, and that none of their claims will fall through the cracks that may exist between the classes that ultimately are certified." Id. Therefore, the pendency of Solomon and the need for judicial economy point strongly in favor of transfer to the Newport News Division.

Plaintiffs' forum shopping argument does not dictate otherwise. As an initial matter, Plaintiffs' premise is flawed because the AWL Defendants' plan can barely be construed as forum shopping. Plaintiffs suggest that the AWL Defendants would have simply moved to transfer the case directly to the Western District of Oklahoma if they had no ulterior motives. But that assertion ignores the possibility that Judge Jackson and this Court, looking at similar motions to transfer by the AWL Defendants, might have reached opposite conclusions, forcing the parties to litigate similar actions in different states—a situation that is likely worse for the AWL Defendants than the current one. The AWL Defendants unsurprisingly chose to avoid that risk by seeking transfer to the Newport News Division first so that one court could resolve the issue. Furthermore, it is unclear how transfer to the Newport News Division could be intended "to enhance the factual circumstances" supporting a transfer to Oklahoma. Pls. Opp. at 16. Nothing about the facts of Solomon or this case would be affected by transfer to the Newport News Division, and consolidation there would seemingly

weigh against transfer to Oklahoma because it would show that some plaintiffs besides Solomon chose to sue in Virginia.

In any event, the AWL Defendants' approach does not frustrate the purpose of the transfer statute. In support of that argument, Plaintiffs cite In re Cragar Industries, 706 F.2d 503 (5th Cir. 1983), which stated that, if a motion to transfer is granted, "the transferee-district should accept the ruling on the transfer as the law of the case and should not re-transfer except under the most impelling and unusual circumstances or if the transfer order is manifestly erroneous." Id. at 505 (internal quotations omitted). But the court was referring to the practice of "tossing cases back and forth" between districts, id., which Plaintiffs do not contend will happen here. Moreover, because venue may be proper in more than one district under Section 1404(a), Mitrano, 377 F.3d at 405, it is reasonable for a transferee court to send a transferred case to a third district that might be more convenient than either of the first two districts. The AWL Defendants' strategy is thus consistent, not at odds, with the purpose of Section 1404(a). As a result, the existence of Solomon still weighs heavily in favor of transfer notwithstanding the AWL Defendants' motivations.

### b. First-to-File Rule

Under the first-to-file rule, "'when multiple suits are filed in different [f]ederal courts upon the same factual

40

issues, the first or prior action is permitted to proceed to the exclusion of another subsequently followed.'" Wenzel, 2015 WL 222179, at *5 (alteration in original) (quoting Allied-General Nuclear Servs. v. Commonwealth Edison Co., 675 F.2d 610, 611 n. 1 (4th Cir. 1982)); see also Learning Network, Inc. v. Discovery Commc'ns, Inc., 11 F. App'x 297, 300-01 (4th Cir. 2001). Similar to the general approach with respect to related actions, the rule helps avoid duplicative litigation and conserve judicial resources, so "the actions being assessed need not be identical if there is substantial overlap with respect to the issues and parties." Byerson, 467 F. Supp. 2d at 635-36. "The rule is not rigid, however, and courts have recognized an exception 'when the balance of convenience favors the second action.'" Wenzel, 2015 WL 222179, at *5 (quoting Learning Network, 11 F. App'x at 302); see also Samsung Elecs., 386 F. Supp. 2d at 724 ("[E]xceptions to the rule are common 'when justice or expediency requires.'" (quoting Genentech, Inc. v. Eli Lilly & Co., 998 F.2d 931, 937 (Fed. Cir. 1993))). Exceptions may also arise in the case of bad faith, anticipatory suits, or forum shopping. Samsung Elecs., 386 F. Supp. 2d at 724.

The AWL Defendants claim that the first-to-file rule further supports a transfer because the complaint in Solomon was

filed two months[10] before Plaintiffs initiated this case. The Solomon Plaintiffs make the same argument, asserting that the close relationship between this case and Solomon make the more tenuous connection between this case and Williams less important in the first-to-file framework. Plaintiffs, however, view the presence of Williams in this Court as essentially dispositive of the first-to-file question. They also contend that, even if the rule applies, the balance of convenience exception militates against transfer because this case has progressed farther than Solomon.

The close relationship between this case and Solomon weighs in favor of transfer. Plaintiffs cannot seriously dispute the similarity between this case and Solomon. Instead, they respond to the AWL Defendants and the Solomon Plaintiffs by pointing to Williams—which was filed in June 2017, well before Solomon—as the true standard to which Solomon should be compared.[11] This argument relies on Wenzel, which involved a motion to transfer

---

[10] Where, as here, an amended complaint relates back to the original complaint, see Fed. R. Civ. P. 15(c)(1), the filing date of the original complaint is the applicable date for first-to-file purposes, see Wenzel, 2015 WL 222179, at *5 n.9.

[11] Plaintiffs also assert that Darlene Gibbs, et al. v. Plain Green, LLC, et al., No. 3:17-cv-495 ("Gibbs") bears on the first-to-file analysis. However, Gibbs is pending before Judge Lauck, not this Court. Given that the Court will not decide any of the issues in that case, it would not be any more efficient for this case to remain here in light of Gibbs.

an action that had facts similar to two other cases: <u>Moses</u>, which was pending in another district, and <u>DCG & T</u>, which was pending before the court considering the motion to transfer. <u>Wenzel</u>, 2015 WL 222179, at *5. The court noted that <u>DCG & T</u> had been filed before <u>Moses</u>, but concluded that the first-to-file analysis applied to the latter instead of the former because <u>Moses</u> "raises substantially the same legal claims against the same group of defendants and . . . was filed first." <u>Id.</u> It also noted that, although "[t]here are some efficiency gains to be had by keeping <u>DCG & T</u> and [<u>Wenzel</u>] in the same court, . . . the first-to-file rule does not dictate that <u>DCG & T</u> takes priority over <u>Moses</u>." <u>Id.</u> Nonetheless, recognizing the "strong relationship" between the claims in <u>DCG & T</u> and the claims in <u>Wenzel</u>, the court concluded that "the overlap between the parties and factual issues plays into the efficient resolution of both cases," and used that factor, among others, to deny transfer. <u>Id.</u> at *6.

Some elements of <u>Wenzel</u> are instructive. Plaintiffs' core argument is that the first-to-file rule cannot apply here because <u>Williams</u> was filed before <u>Solomon</u>. But, even if this case is related to <u>Williams</u>, it is far more closely related to <u>Solomon</u>. The plaintiffs in <u>Williams</u>—who include Hengle and Williams—may have asserted similar RICO, usury, and unjust enrichment claims to those in this case, but <u>Williams</u> involves a

43

different tribe, different tribal lending businesses, and a different "architect" of the rent-a-tribe scheme at issue in that case. As a result, the facts and the defendants in this case and Williams are completely different. This disparity is thus greater than in Wenzel, where the action to be transferred had the same defendants and some of the same facts as DCG & T. See 2015 WL 222179, at *5. The connection between this case and Solomon, however, is substantial. Consequently, even if might be somewhat efficient to keep this case and Williams in the same court, Williams should not take priority over Solomon in the first-to-file analysis simply because it was filed first. See id.

Key factual distinctions, however, limit the applicability of the rest of Wenzel here. The court only relied on the pendency of DCG & T before the court to deny the motion to transfer because there was a "strong relationship" between both cases and a clear "overlap between the parties and factual issues." Id. at *6. Here, on the other hand, the relationship between this case and Williams is relatively weak, and the parties and factual issues barely overlap. As a result, keeping those cases before this Court does not serve the goals of judicial efficiency because a decision based on the unique facts of one case is unlikely to have much effect in the other case.

Accordingly, the Court does not give the pendency of Williams much weight when considering the first-to-file rule.

The relative lack of progress in Solomon is a more notable factor. When assessing the balance of convenience in the context of the first-to-file rule, "'courts have declined to defer to the first-filed action when little if anything has been done to advance that action to trial.'" Id. (quoting Affinity Memory & Micro, Inc. v. K & Q Enters., Inc., 20 F. Supp. 2d 948, 954 (E.D. Va. 1998)). Based on a review of the Solomon docket alone, Plaintiffs appear to be right that the case has not proceeded very far. Although the complaint was filed on December 15, 2017, the Solomon Plaintiffs and the AWL Defendants jointly moved on February 23, 2018 to allow the filing of an amended complaint and an extended briefing schedule for responsive motions. ECF Nos. 35, 37 (Docket No. 4:17-cv-145). After the Solomon Amended Complaint was timely filed on March 9, defendants filed various motions in response on April 8 and 9. However, the Solomon Plaintiffs' responses to those motions are not due until June 8. See ECF No. 92 (Docket No. 4:17-cv-145). In contrast, most responsive motions to the Complaint in this case were ripe as of May 25, and the Court has ordered the parties to conduct jurisdictional discovery regarding the sovereign immunity arguments raised in the AWL Defendants' and Curry's unripe motions to dismiss. See ECF No. 76. The "time and energy spent

45

by this Court in advancing this case" to trial at a faster pace than the court in Solomon may influence whether convenience prevents the first-to-file rule from favoring transfer here. Wenzel, 2015 WL 222179, at *6.

Nonetheless, two factors suggest that the progress of this case compared to Solomon should not affect the transfer analysis much, if at all. First, the expected ripe date of the responsive motions in Solomon is not meaningfully later than the equivalent motions here, and can be attributed to the sizable number of defendants in that case more than the court's failure to move the case forward. In addition, although Plaintiffs tout the imminent jurisdictional discovery deadlines in this case, the AWL Defendants' and Curry's motions to stay jurisdictional discovery indicate that the actual progress of such discovery might be limited.

Second, progress cannot be measured in a vacuum. For example, where plaintiffs have acquired more information in support of their claims before filing suit, the lack of subsequent discovery does not necessarily mean that the case has not made progress; it may simply reflect that those plaintiffs need less discovery to reach the same level of progress as other plaintiffs who acquired little to no relevant evidence before initiating litigation. The latter seems to be true here. The Solomon Plaintiffs note that they filed their complaint only

after an eleven-month investigation consisting of interviews and communications with third parties and victims to uncover the facts of Curry's alleged rent-a-tribe scheme. As a result, the complaint contained thorough allegations about every part of the operation, which the Solomon Amended Complaint has only enhanced. In comparison, the facts alleged in the Complaint here are relatively sparse and seem to be supported by public filings and news articles, not independent research. Indeed, the Complaint bears a close resemblance to complaints in other rent-a-tribe cases in the Richmond Division, like Williams and Gibbs. Nothing prohibits Plaintiffs or their counsel from using a form complaint, but their claims of progress ring hollow when the discovery they have purportedly achieved was necessitated in part by the Complaint's simplicity. Given these mitigating factors, the Court concludes that the statuses of this case and Solomon do not meaningfully affect the first-to-file analysis. Even if they do, the effect is minor, and is far outweighed in the interest of justice framework by the relatedness of Solomon, which provides an independent basis for transfer to the Newport News Division. See Byerson, 467 F. Supp. 2d at 636. The interest of justice, therefore, still weighs substantially in favor of transfer.

Considering all the Section 1404(a) factors, although Plaintiffs' choice of forum and the convenience of the witnesses

and parties weigh against transfer or are neutral, the interest of justice clearly tilts the balance towards transfer. Accordingly, the Court will grant the AWL Defendants' motion to transfer.

## CONCLUSION

For the foregoing reasons, the MOTION TO TRANSFER TO THE NEWPORT NEWS DIVISION BY AWL, INC., AMERICAN WEB LOAN, INC. AND RED STONE, INC. (ECF No. 3) and NATIONWIDE AWL CLASS PLAINTIFFS' MOTION FOR LIMITED INTERVENTION (ECF No. 77) will be granted.

It is so ORDERED.

/s/ _____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: June 15, 2018